UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARBEJDSMARKEDETS TILLAEGSPENSION ("ATP"); INDUSTRIENS PENSIONSFORSIKRING A/S; and ARCA SGR S.p.A. | : |
| Plaintiffs, | : |
| v. | : |
| VIVENDI, S.A., JEAN-MARIE MESSIER and GUILLAUME HANNEZO, | : |
| Defendants. | : |

Case No.

**07 CIV 9229**

**COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
OCT 15 2007
U.S.D.C. S.D.N.Y.
CASHIERS

**THE SHAPIRO FIRM, LLP**
Robert J. Shapiro
Jonathan S. Shapiro
500 Fifth Avenue, 14th Floor
New York, New York 10110
Telephone: 212-391-6464

*Local Counsel for Plaintiffs*

**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**
David Kessler
Stuart L. Berman
Darren J. Check
John A. Kehoe
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: 610-667-7706

*Counsel for Plaintiffs*

## Table of Contents

I.    NATURE OF THE ACTION ............................................................. 2

II.   JURISDICTION AND VENUE ......................................................... 7

III.  PARTIES ......................................................................................... 13

      A.    Plaintiffs ............................................................................... 13

      B.    Vivendi .................................................................................. 14

      C.    Individual Defendants .......................................................... 15

IV.   FACTUAL BACKGROUND ........................................................... 17

      A.    Vivendi's Unrestrained Growth through Acquisitions .......... 17

      B.    Vivendi's Use of Improper Accounting to Artificially
            Inflate Its Stock Price ......................................................... 22

            1.    Accounting Rules Applicable to Foreign Issuers ......... 22

            2.    Defendants Failed to Timely Write Down Impaired Goodwill ...... 22

                  (i)    Canal+ ................................................................. 26

                  (ii)   U.S. Filter .......................................................... 34

            3.    Defendants Improperly Consolidated Vivendi's Balance Sheet ........ 35

            4.    Defendants Improperly Recognized Revenue .............. 40

            5.    Defendants Improperly Inflated Canal+'s Assets ........ 42

            6.    Defendants Improperly Manipulated Vivendi's Reported EBITDA .......... 43

                  (i)    Improper EBITDA Adjustments during the
                         Second Quarter of 2001 ...................................... 44

                  (ii)   Improper Adjustments of UMG's EBITDA ....... 45

            7.    Defendants Failed to Disclose Vivendi's 2% Interest
                  in Elektrim Telekomunikacja ................................... 47

ii

THIRD CLAIM FOR RELIEF Violations of Section 15 of the Securities Act
(Against All Defendants) ............................................................................. 129

SECOND CLAIM FOR RELIEF Violations of Section 12(a)(2) of the Securities
Act (Against All Defendants) ...................................................................... 127

FIRST CLAIM FOR RELIEF Violations of Section 11 of the Securities Act
(Against All Defendants) .............................................................................. 127

XI.    CLAIMS FOR RELIEF ....................................................................... 127

X.    TOLLING OF THE STATUTE OF LIMITATIONS ......................... 126

IX.    PRESUMPTION OF RELIANCE ........................................................ 125

VIII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .......... 124

VII.    LOSS CAUSATION .............................................................................. 121

VI.    DEFENDANTS' SCIENTER ................................................................ 115

V.    FALSE AND MISLEADING STATEMENTS ....................................... 69

        D.    The Truth Begins to Emerge ....................................................... 61

                7.    Magnitude of the Undisclosed Liquidity Crisis ................ 58

                6.    Defendants Failed to Disclose Vivendi's 2001 Stock Buybacks ..... 57

                        (ii)    The Maroc Telecom Side Agreement ...................... 56

                        (i)    Cegetel's Current Account ....................................... 54

                5.    Defendants Failed to Disclose Material Commitments Concerning
                        Cegetel and Maroc Telecom .............................................. 54

                4.    Defendants Failed to Disclose Acceleration Clauses in Vivendi's Loans ... 53

                3.    Defendants Failed to Disclose Certain Off Balance Sheet Liabilities ......... 50

                2.    Defendants Failed to Disclose the Insufficiency of
                        Vivendi's Working Capital .............................................. 49

                1.    Defendants Failed to Disclose Vivendi's Inability to Generate
                        Expected Cash Flows from the Company's Costly Acquisitions ............... 49

        C.    Defendants Concealed Vivendi's Growing Liquidity Crisis .............. 49

iii

(Against Defendants Messier and Hannezo) ........ 131

FOURTH CLAIM FOR RELIEF Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants) ........ 133

FIFTH CLAIM FOR RELIEF Violation of Section 18 of the Exchange Act (Against All Defendants) ........ 135

SIXTH CLAIM FOR RELIEF Violation of Section 20(a) of the Exchange Act (Against Defendants Messier and Hannezo) ........ 136

SEVENTH CLAIM FOR RELIEF Common Law Fraud (Against All Defendants) ........ 137

EIGHTH CLAIM FOR RELIEF Common Law Negligent Misrepresentation (Against All Defendants) ........ 139

NINTH CLAIM FOR RELIEF Unjust Enrichment (Against All Defendants) ........ 141

XII. PRAYER FOR RELIEF ........ 142

Arbejdsmarkedets Tillægspension, Industriens Pensionsforsikring A/S, and Arca SGR

S.p.A.; ("Plaintiffs"), by their undersigned attorneys, allege the following upon personal

knowledge as to themselves and their own acts, and upon information and belief as to all other

matters. Plaintiffs' information and belief is based on, *inter alia*, an investigation made by and

through their undersigned counsel, which included, among other things, a review of (1) Vivendi

Universal, S.A. (now known as Vivendi, S.A. and hereafter referred to as "Vivendi" or the

"Company") filings with the Securities and Exchange Commission ("SEC") and the Commission

des Operations des Bourse ("COB") (now part of the Autorité des marchés financiers), the

French equivalent of the SEC; (2) Vivendi press releases; (3) public statements by or on behalf

of Vivendi and/or the other Defendants; (4) analyst reports concerning Vivendi; (5) newspaper

and other media coverage regarding Vivendi, its business, and/or the Individual Defendants (as

defined below); and (6) pleadings in litigation naming Vivendi as a defendant, including *In re*

*Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH) (S.D.N.Y.) (the "Securities Class

Action"); *SEC v. Vivendi Universal, S.A., Jean-Marie Messier and Guillaume Hannezo*, No. 03

Civ 10195 (PKC) (S.D.N.Y.) (the "SEC Action"); *Capitalia Asset Management SGR, S.p.A. and*

*Capitalia Investment Management S.A. v. Vivendi, S.A., Jean-Marie Messier and Guillaume*

*Hannezo*, No. 07 Civ. 5742 (RJH) (S.D.N.Y.); and *Norges Bank v. Vivendi, S.A., Jean-Marie*

*Messier and Guillaume Hannezo*, No. 07 Civ. 7370 (RJH) (S.D.N.Y.) (the "Norges Bank

Action").

Many of the facts supporting the allegations contained herein are known only to

Defendants or are exclusively within their custody and/or control. Plaintiffs' investigation into

the factual allegations contained herein is continuing, and many of the facts related to Plaintiffs'

allegations are known only by the Defendants named herein or are exclusively within their

1

custody or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after Plaintiffs have had a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    Between at least October 30, 2000 and August 14, 2002 (the "Relevant Period"), defendant Jean-Marie Messier ("Messier"), Vivendi's Chief Executive Officer ("CEO") and Chairman (until he was forced to resign on July 3, 2002), and defendant Guillaume Hannezo ("Hannezo"), Vivendi's Chief Financial Officer ("CFO") (until he resigned on July 9, 2002), issued materially false and misleading statements and caused Vivendi to file materially false and misleading financial statements with the SEC in violation of the federal securities law and common law.

2.    Immediately before and during the Relevant Period, defendant Messier caused Vivendi to embark on an extraordinary $77 billion acquisition binge that rapidly transformed Vivendi from a small centuries-old French-based water utility into a huge international media and telecommunications conglomerate.  In pursuit of this rapid transformation, Messier and Hannezo (collectively the "Individual Defendants") reported the Company's strong revenue and earnings, and portrayed Vivendi as a company that was generating sufficient cash flow and earnings to satisfy its debt obligations on approximately $21 billion in debt that it amassed to finance its massive $77 billion acquisition spree.  As a result of the Individual Defendants' repeated upbeat earnings announcements and assurances concerning the Company's growth and its ability to meet its debt obligations, the price of Vivendi's American Depository Shares ("ADSs") traded on the New York Stock Exchange ("NYSE"), and ordinary shares traded on Compartment A of Eurolist (formerly the *Premier marché*) by Euronext Paris S.A. (hereinafter referred to as the "Paris Bourse"), was artificially inflated throughout the Relevant Period.

2

3.    As the Individual Defendants knew but did not disclose, Vivendi's operations and financial results were dramatically weaker than what their public statements portrayed. For example, immediately prior to and during the Relevant Period, Vivendi (using its increasingly inflated stock as currency to finance many of its acquisitions) bid aggressively for several large companies, and substantially overpaid for them. Subsequent events (unbeknownst to investors) confirmed that these acquired entities could not generate sufficient cash flow to justify their high acquisition cost, with the result being that Vivendi's balance sheet was bloated with tens of billions of dollars of inflated "goodwill" whose value had been materially impaired and should have been written down. The failure of the Vivendi conglomerate to generate earnings in line with its publicly-touted estimates further threatened the Company's liquidity and its ability to generate the amount of cash from operations necessary to satisfy its obligations on over $21 billion worth of debt.

4.    To conceal the deteriorating state of Vivendi's newly constructed corporate empire, Defendants engaged in a variety of improper asset and revenue inflating practices immediately prior to and during the Relevant Period that enabled the Company to artificially inflate its reported assets, revenue, income and earnings per share ("EPS"), thereby rendering Vivendi's publicly filed financial statements and other communications regarding the Company's financial performance complained of herein to be materially false and misleading.

5.    Vivendi's improper accounting (as detailed in Section IV.B, infra) included, inter alia, failing to timely write-off of over €29 billion in goodwill associated with Vivendi's acquisitions, including its acquisitions of U.S. Filter Corp. ("U.S. Filter") and Canal+ S.A. ("Canal+"). Defendants' failure to take timely write-offs for impaired goodwill in violation of U.S. generally accepted accounting principles ("U.S. GAAP") caused Vivendi to improperly

4

delay recognizing offsetting charges of over €29 billion against the Company's earnings during the Relevant Period. As a result, Vivendi's reported earnings and EPS were artificially inflated under U.S. GAAP by tens of billion of dollars during the Relevant Period.

6.     In addition to its failure to properly account for goodwill, Vivendi also engaged in a variety of improper revenue recognition and expense-deferring practices, and other related misconduct, to artificially inflate its reported financial performance during the Relevant Period. These practices included, *inter alia*, (a) reporting and consolidating into its own reported financial results billions of dollars of revenue from entities such as Cegetel and Telecom (both defined below) in which Vivendi held only a minority stake and in which Vivendi did not control, in violation of U.S. GAAP (as detailed in Section IV.B.3, *infra*); (b) recognizing 100% of the revenue "upfront" (*i.e.* in contract *year* one) on billions of dollars of multi-year contracts in a practice internally referred to as "booking backlog," even though Vivendi had not yet performed its obligations under those multiyear contracts and U.S. GAAP required that the revenue on such contracts be recognized ratably over time when Vivendi actually performed the contracted-for services (as detailed below in Section IV.B.4, *infra*); (c) improperly inflated Canal+'s assets (as detailed below in Section IV.B.5, *infra*); (d) improperly manipulated Vivendi's reported EBITDA (as detailed below in Section IV.B.6, *infra*); and (e) failed to disclose a 2% interest in Elektrim Telekomunikacja (as detailed below in Section IV.B.7, *infra*).

7.     The foregoing improper accounting practice not only allowed Vivendi to keep its stock price artificially high, but also facilitated the Individual Defendants' fraudulent efforts to conceal the Company's growing liquidity crisis. For example, on December 6, 2001, defendant Messier assured the investing public that "Vivendi Universal is in a very strong position, with solid performance in virtually every business," and just weeks later (after having announced that

it would raise $2.5 billion by selling a $1.5 billion interest in British Sky Broadcasting Plc

("BSkyB") and a $1.06 billion interest in Vivendi) stated that certain asset sales

would give Vivendi "room to manoeuvre" for additional acquisitions and enable it "to cover any

eventual needs from different opportunities for strategic partnerships." On December 17, 2001,

Vivendi then announced that it would be acquiring USA Networks for approximately $10 billion.

8.    Unbeknownst to investors, however, Vivendi's business at that time was anything

but "strong" and decidedly lacked "room to manoeuvre." To the contrary, as *The Wall Street*

*Journal* later reported, the Company then faced a potentially catastrophic liquidity crisis:

On Dec. 13, [2001], Guillaume Hannezo sent Jean-Marie Messier, chairman of Vivendi Universal SA, a desperate handwritten plea.

"*I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat*," wrote Mr. Hannezo, the company's chief financial officer. "*All I ask is that all of this not end in shame.*"

*That very day, unknown to investors and the Vivendi board, the company had narrowly averted a downgrade by credit-rating agencies, which would have made it difficult to borrow money and plunged the company into a cash crisis.* Mr. Hannezo . . . implored his boss and longtime friend to take serious steps to reduce Vivendi's ballooning debt.

When the company's board met the next day to consider whether to approve a roughly $10 billion acquisition of USA Networks Inc.'s TV and film businesses, *Mr. Messier made no mention of the close call with the rating agencies. Instead, when a director asked about Vivendi's financial profile, Mr. Messier said the company had no problem,* according to two directors who were there.

The board endorsed the USA Networks deal. . . . But Vivendi was already in dire financial straits. . . .

As new management struggles to salvage the French conglomerate, it has become clear that Vivendi came close to financial disaster far earlier than previously thought. That picture is starkly at odds with *the one repeatedly presented by Mr. Messier to investors and his board.*

5

"How Messier Kept Cash Crisis at Vivendi Hidden for Months; Media Giant Was at Risk Well Before Investors Knew," *The Wall Street Journal*, Oct. 31, 2001, at A1 (emphasis added).

9. Without publicly disclosing the adverse material facts facing the Company, and while affirming and materially misrepresenting the truth concerning the Company's actual prospects, financial performance, improper accounting practices and liquidity situation, the Individual Defendants did not hesitate to take advantage of the market's ignorance of the truth by causing Vivendi to purchase numerous companies during the Relevant Period using artificially inflated Vivendi stock as currency. By maintaining an artificially inflated price for Vivendi's stock, the Individual Defendants were able, in essence, to purchase tens of billions of dollars worth of The Seagram Company Ltd.'s ("Seagram"), Canal+'s and other entities' stock at a discount since Vivendi was paying for its interest in these companies with a currency (Vivendi's own stock) that was really worth a fraction of its publicly-traded price.

10. Eventually the weight of Defendants' material misrepresentations and distorted financial results collapsed upon the scheme. In June 2002, an immediate and severe cash shortage threatened Vivendi's continued viability. Over the course of the next several weeks, the truth about Defendants' deception was revealed.

11. On July 3, 2002, Vivendi's board ousted Messier. Hanrezo left the Company just days later. Thereafter, the Company's new management was forced to disclose that the Company would immediately have to secure both bridge and long-term financing to avoid default on its largest credit obligations. During a hearing before the French Parliament in September 2002, Vivendi's new chairman admitted that had Messier remained Vivendi's CEO beyond July 3, 2002, the Company undoubtedly would have gone bankrupt "within 10 days."

12.    The Individual Defendants may have succeeded in their plan to transform Vivendi into a multinational conglomerate, but the Company, and ultimately its shareholders, would come to pay an enormous price for Messier's and Hannezo's unchecked ambition and their concomitant material misrepresentations. Among other things, Defendants' actions resulted in (1) a crippling drop in the prices of Vivendi's ordinary shares traded on the Paris Bourse and ADSs traded on the NYSE when the fraud was finally revealed; (2) the Company's de-listing from the NYSE; (3) an onslaught of civil litigation; and (4) the imposition of a massive civil fine by the SEC, as more fully particularized below.

13.    The disclosure of Defendants' fraud caused a precipitous decline in the trading prices of the Company's securities. The Company's ADSs lost 85% of their value from their Relevant Period high of $75.50 and its ordinary shares declined 83.9% from their Relevant Period high of €86.50. These declines resulted in significant damage to the Company's shareholders, including Plaintiffs.

## II.    JURISDICTION AND VENUE

14.    The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77K, 77l(a)(2) and §77o; Sections 10(b), 18 and 20(a) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78r and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. § 240.10b-5. The claims alleged herein also arise under common law.

15.    The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a); Section 22 of the Securities Act, 15 U.S.C. §77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and principles of supplemental jurisdiction in accordance with 28 U.S.C. § 1367.

7

8

16.     In connection with the acts and course of conduct alleged herein, the Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities markets.

17.     Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c) and (d). Many of the acts, transactions and conduct that occurred in furtherance of Defendants' fraudulent scheme complained of herein occurred in substantial part and/or had an effect in this District, including the creating and implementation of the manipulative devices and contrivances. Further, Vivendi, and the Individual Defendants conducted substantial business and had substantial contacts within this District during the Relevant Period.

18.     Vivendi is headquartered in Paris, France, but conducted substantial business and maintained the Company's U.S. headquarters in this District during the Relevant Period and through the present. In addition, defendant Messier became a resident of the District beginning in 2001 when he moved himself and his family into a Manhattan penthouse apartment. As alleged in the Securities Class Action, during a February 17, 2002 CNN interview, defendant Messier explained that he moved to New York in furtherance of his responsibilities as Vivendi's CEO and Chairman of the Board. Specifically, that

Moving to New York, yes there [were] very simple reasons. The first one Vivendi Universal has 50,000 U.S. employees. They have a boss. Where is the boss? The boss is in the U.S. He's working there. I can meet with them. I can spend time with them. He is really the boss.

The second goal was Vivendi International is a new group for many U.S. investors in the media field. We need and I needed to spend more time with the U.S. Universal community to explain the Vivendi Universal story, to go through all reasons of performances of prospects, and I think that it's just better to do it being in American, than being outside.

19.     The Defendants' domestic conduct was not "merely preparatory" or perfunctory acts, but led directly to Plaintiffs' losses.  Accordingly, this Court may properly apply subject matter jurisdiction over the claims of foreign purchasers of Vivendi ordinary shares traded on foreign exchanges, including the Paris Bourse, under the "conduct test" articulated by the Second Circuit, which provides that a federal court has subject matter jurisdiction if (1) the defendant's activities in the United States were more than "merely preparatory" to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States "directly caused" a plaintiff's losses.  The facts alleged herein show that substantial activity in furtherance of Defendants' fraud occurred within the United States and directly caused Plaintiffs' losses.

20.     The Court has already exercised subject matter jurisdiction over the federal securities claims in the Securities Class Action.  *See In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) (the "Court's Opinion").  In denying Defendants' motions to dismiss pursuant to Rule 12(b)(1), the Court held that it possessed subject matter jurisdiction over claims brought by foreign purchasers who acquired Vivendi ordinary shares on foreign exchanges. *Id.* at 169-70.  The Court Opinion noted that Defendants did not dispute that (1) Messier and Hannezo had relocated to the United States in September 2001; (2) that Vivendi filed Forms 20-F and 6-K with the SEC during the Relevant Period; (3) that Defendants disseminated other materials to investors in the United States; and (4) that Vivendi made numerous acquisitions in the United States. *Id.*

21.     The Court further held that the Securities Class Action Complaint sufficiently alleged grounds for the Court to exercise subject matter jurisdiction over the claims of foreign investors against Defendants including that, in furtherance of the alleged scheme, Vivendi had

6

acquired well-known U.S. entertainment and publishing companies, such as Universal Studios, Houghton Mifflin and USA Networks, and to successfully accomplish this plan, took on a $21 billion debt while allegedly fraudulently assuring all investors "through false and misleading reports filed with the SEC and news releases that it had sufficient cash flow to manage its debt."

*Id.*

22.    In addition to substantial U.S. conduct that occurred in furtherance of the fraud that is alleged herein, Vivendi has a vast U.S. presence that justifies the exercise of subject matter jurisdiction over the claims of Plaintiffs who, relying on the health and value of Vivendi's substantial U.S. businesses, acquired Vivendi ADSs traded on the NYSE and/or ordinary shares traded on the Paris Bourse, and were defrauded by the Defendants' material misrepresentations.

23.    Defendants perpetrated the alleged fraud upon Plaintiffs through material misrepresentations made in connection with the Company's $77 billion acquisition spree, during which time the Company made several high profile acquisitions, spending in excess of $54 billion for various U.S.-based entities. For example, the following companies, among others, were acquired in whole or in part by Vivendi.

| COMPANY ACQUIRED | U.S. LOCATION | PURCHASE PRICE |
|---|---|---|
| Waste Management Inc. | Houston, TX | € 103.5 million |
| U.S. Filter Corp. | Palm Desert CA | $ 6.2 billion |
| Seagram Company Ltd. | University City, CA | $ 34 billion |
| Uproar.com | New York, NY | $ 128 million |
| MP3.com, Inc. | San Diego, CA | $ 400 million |
| Emusic.com | San Diego, CA | $ 24 million |
| Houghton Mifflin Co. | Boston, MA | $ 2.2 billion |
| EchoStar Communications Corp. | Littleton, CO | $1.5 billion |
| USA Networks | New York, NY | $10.3 billion |

24.    In addition to the U.S acquisitions, the Court's Opinion noted that Messier and Hannezo were alleged principal actors in this scheme and spent half their time within the United

10

11

States from the middle through the end of the Relevant Period, for the specific purpose to increase investments by U.S. investors in Vivendi. *Id.*

25.     The Court also found that it was reasonable to infer from the decision by Messier and Hannezo to move to the United States during the Relevant Period, allegedly to better direct Vivendi's operations and to more effectively promote misleading perceptions on Wall Street, that the alleged fraud on the NYSE was a "substantial" or "significant contributing cause" of the foreign investors' decisions to purchase the Company's stock abroad. *Id.* at 170.

26.     In an Order denying reconsideration of the Court's Opinion in the Securities Class Action, the Court reconfirmed that it had subject matter jurisdiction over foreign investors' claims against Defendants because, *inter alia*, (i) allegedly false statements emanated from the U.S.; (ii) Messier and Hannezo, Vivendi's two highest officers, moved to and operated Vivendi from the U.S. allegedly to better implement the fraudulent scheme; and (iii) Messier and Hannezo carried out significant acts in the U.S. in furtherance of the alleged fraud and as alleged controlling officers of Vivendi. *See In re Vivendi Universal, S.A. Sec. Litig.,* No. 02 Civ. 5571 (RJH), 2004 WL 2375830 (S.D.N.Y. Oct. 22, 2004) (the "Reconsideration Opinion"). The Reconsideration Opinion specifically noted that "this Court concurs with Judge Baer's opinion finding jurisdiction over this dispute pursuant to the conduct test . . . ." *Id.* at *7.

27.     Further, pursuant to the judicially prescribed "effects test" for asserting extraterritorial jurisdiction, this Court may properly exercise subject matter jurisdiction over Plaintiffs' claims because Defendants' improper conduct had an impact upon the NYSE, the U.S. market on which Vivendi sold ADSs. Defendants' improper conduct, including that which was carried out in the U.S., artificially inflated the price of the Company's securities and affected the integrity of the prices paid for Vivendi securities in the United States and abroad. There was but

a single worldwide market for Vivendi ordinary shares traded on foreign exchanges, including the Paris Bourse, and ADSs traded on the NYSE, which traded in tandem, and that market was defrauded by Defendants' conduct, causing extensive effects in this country and abroad.

28.     In the U.S., Vivendi sold securities whose prices were artificially inflated by means of false and misleading statements in financial reports, a Form F-4 Registration Statement filed with the SEC on October 30, 2000, and various press releases. Vivendi actively marketed and sold these securities in the U.S. despite its false reporting of its financial condition as alleged herein. Many, if not most, of the Company's press releases shared a New York dateline. Further, throughout the Relevant Period, Vivendi regularly filed Forms 20-F and Forms 6-K with the SEC that contained materially false and misleading information as detailed herein.

29.     Vivendi also organized and participated in meetings in New York with the financial community, including with Wall Street analysts, to review and report on Vivendi's purported financial results. As alleged herein, Defendants issued materially false and misleading statements during those meetings.

30.     According to Vivendi's Form 20-F for the fiscal year ended December 31, 2001, filed with the SEC on May 28, 2002 (the "2001 Form 20-F"), over 54% of Vivendi's long lived assets, then valued at €53.5 billion, were located in the U.S. The 2001 Form 20-F also reported that Vivendi's U.S. revenue exceeded €7 billion. As alleged in the Norges Bank Action, on January 19, 2002, at a Los Angeles luncheon, Defendant Messier stated that Vivendi was "forty percent within the United States and sixty percent out of the states," and in a February 17, 2002 interview on CNN, stated that the Company had "50,000 U.S. employees."

31.     As news came to light near the end of the Relevant Period of Vivendi's near-bankruptcy, the SEC commenced an investigation within this District. In addition, the SEC

brought enforcement proceedings against Vivendi, Messier and Hannezo in this District for

violations of U.S. securities laws, alleging substantial fraudulent conduct in the U.S., including

the issuance of false and misleading statements to investors in the U.S. The SEC asserted that

certain of the acts and practices described in the SEC Action that constituted violations of the

Securities Act and the Exchange Act occurred within this District. In further support of the SEC

Action, the SEC also alleged that the Court had subject matter jurisdiction because Vivendi

conducted business and maintained offices in this District during the Relevant Period, and,

during at least part of the Relevant Period, Messier and Hannezo resided in this District. As part

of the resolution of the SEC Action, Defendants executed a consent decree entered in this Court.

32.    Further, in April 2004, the SEC issued a cease-and-desist order against John

Luczycki, Vivendi's former Chief Accounting Officer and controller, who resided in New York,

finding that during the period December 2000 to July 2002, he had violated United States anti-

fraud statutes.

## III.    PARTIES

### A.    Plaintiffs

33.    Arbejdsmarkedets Tillaegspension ("ATP") is a self-governing institution that has

no shareholders and "owns itself under its constitution" under Danish law, that was established

by statute in 1964 (the "ATP Act") with a view to ensuring a larger basic pension for large

portions of the Danish population – a supplement to the state retirement pension. ATP is a fully

funded insurance scheme and is funded by mandatory contributions from employees and their

employers. The amount of the contributions is determined by the Danish government and

adjusted from time to time. The fund size is approximately $60 billion. Currently,

13

approximately 4.4 million employees are contributing to the plan and approximately 630,000

pensions and death benefits are being paid..

34.    Industriens Pensionsforsikring A/S ("Industriens") is a Danish pension fund for

blue-collar workers across Denmark. The fund serves nearly 450,000 members.

35.    Arca SGR S.p.A. ("Arca") was established in 1983 and is a Milan, Italy based

mutual fund manager.

**B.    Vivendi**

36.    Vivendi is a "société anonyme" organized under the laws of France with its

corporate headquarters at 42 Avenue de Friedland 75380, Paris, Cedex 08, France. Vivendi has

offices in this District at 800 Third Avenue, New York, NY 10022. Between October 30, 2000

and April 26, 2006, Vivendi was known as Vivendi Universal, S.A.

37.    During the Relevant Period, Vivendi described itself as a global conglomerate

engaged in business that was focused primarily on two core areas: "Media and Communications"

and "Environmental Services." Vivendi's Media and Communications business was divided into

five segments: (a) Music; (b) Publishing; (c) TV and Film; (d) Telecom; and (e) Internet.

Vivendi was formed through the December 2000 merger of Vivendi, Seagram and Canal+, with

Vivendi continuing as the surviving parent entity (this three-way merger is hereinafter referred to

as the "Merger Transactions"). Vivendi is named herein as a defendant in its own right and as

the successor entity and successor-in-interest to Vivendi Universal, S.A., Seagram and Canal+.

At all times relevant to this Complaint, Vivendi sold shares in the form of ADSs on the NYSE

and ordinary shares on the Paris Bourse.

38.    Vivendi Environment, a subsidiary of Vivendi, operates the Company's

worldwide environmental services business, including its water utility operations.

14

### C.    Individual Defendants

39.    Defendant Jean-Marie Messier ("Messier") was Vivendi's CEO and Chairman of the Board during the Relevant Period until he was forced to resign from the Company on July 3, 2002. He had been CEO of Vivendi's predecessor company since 1994. Messier was also Chairman of the Supervisory Board of Vivendi Environnement and Canal+. Messier was a control person of Vivendi within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act. As alleged in the Securities Class Action, Messier received compensation of $4.8 million in 2001 despite the Company's record loss, as well as various other perquisites, including use of a $17 million New York penthouse apartment the Company had acquired for him.

40.    Defendant Guillaume Hannezo ("Hannezo") was Vivendi's CFO during the Relevant Period, until he resigned from the Company on July 9, 2002. As the Securities Class Action alleged, the Associated Press reported that Hannezo was a "close collaborator" of Messier. Hannezo was a control person within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act.

41.    It is appropriate to treat the Individual Defendants as a group for group pleading purposes and to presume that the materially false and misleading and incomplete information conveyed in the Company's public filings, press releases and other publications, as alleged herein, are the collective actions of the Individual Defendants. As officers and/or directors and controlling persons of a publicly held company whose ADSs were registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and

performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

42.    The Individual Defendants, by virtue of their positions of control and authority as officers or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Relevant Period. The Individual Defendants were provided with copies of the documents alleged herein to be misleading, prior to or shortly after their issuance, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, they are responsible for the accuracy of the public reports and releases detailed herein.

43.    The Individual Defendants directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels. The Individual Defendants were privy to confidential proprietary information concerning the Company and its business operations, products, growth, financial statements, and financial condition, as alleged herein, and were involved in the drafting, preparation and/or dissemination of the various public, shareholder and investor reports and other communications that were materially false and misleading as alleged herein. Messier and Hannezo both were aware of, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

44.     Because of their Board memberships and/or executive and managerial positions with the Company, the Individual Defendants had access to the adverse non-public information about the business, operations, finances, markets, financial statements, and present and future business prospects of Vivendi particularized herein via access to internal corporate documents, conversations or communications with corporate officers or employees, attendance at management and/or Board of Directors' meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

## IV.     FACTUAL BACKGROUND

### A.     Vivendi's Unrestrained Growth through Acquisitions

45.     Vivendi's origins date back to 1853 when it began as a French-based water company named Compagnie Générale des Eaux ("CGE"). CGE had focused primarily on the water market until 1976 when Guy Dejouany became CEO and, following a series of acquisitions, expanded into other business areas, including waste management, energy, transport services and construction and property.

46.     Messier became chairman of CGE in June 1996, and changed its name to Vivendi in April 1999. Beginning at least as early as 1998, and continuing throughout the Relevant Period, Messier embarked on a multi-billion dollar acquisition spree that transformed Vivendi into a multinational conglomerate. For example, as alleged in the Securities Class Action, in the two years prior to the Relevant Period, Vivendi acquired the following companies:[1]

| COMPANY ACQUIRED | CLOSING DATE | % ACQUIRED |
| --- | --- | --- |

---

[1] Pre-existing ownership interest, if any, is shown in parenthesis.

18

| | | |
|---|---|---|
| Quotidien Santé | 4/9/98 | 100% |
| Linjebuss AB | 4/15/98 | 66.7% (33% owned) |
| Havas SA / Old | 6/2/98 | 70% (30% owned) |
| Cia de Saneamento do Parana | 6/8/98 | 41.38% |
| Ediciones Doyma SA | 6/25/98 | 50% |
| L'Etudiant | 11/10/98 | 100% |
| ScVK | 11/18/98 | 100% |
| OVP-Vidal | 11/23/98 | 100% |
| Vivendi Universal | 12/15/98 | 10.5% |
| ALPINA GmbH | 1/5/99 | 100% |
| Cendant Software | 1/12/99 | 100% |
| Pathe | 1/26/99 | 19.6% (5% owned) |
| FCC | 3/5/99 | 28% |
| Aigue | 4/20/99 | 100% |
| US Filter Corp. | 4/30/99 | 100% |
| SL Tunnelbanan AB | 5/4/99 | 60% |
| MediMedia | 5/12/99 | 100% |
| 18 Litre Water Division | 5/20/99 | 100% |
| Sani Gestion Inc. | 6/11/99 | 100% |
| MUSIDISC | 6/30/99 | 99.02% |
| Canal+ | 7/22/99 | 15% (34% owned) |
| British Sky Broadcasting Plc | 7/22/99 | 4% (20.5% owned) |

19

| | | |
|---|---|---|
| Aqua Alliance Inc. | 8/24/99 | 17% (83% owned) |
| Pathe | 9/30/99 | 80.2% (19.8% owned) |
| Superior Services Inc. | 11/11/99 | 100% |
| 23 GPU In. Power plants | 11/24/99 | 100% |
| Elektrim Telekomunikacja | 12/9/99 | 49% |
| Daesan Power Plant | 12/17/99 | 100% |
| The StayWell Company | 2/29/00 | 100% |
| Three V Health Inc. | 2/29/00 | 100% |
| Haniel Rohr, Kanal Service & Haniel Industrie Reinigung | 3/28/00 | 100% |
| Prize Central Network | 3/29/00 | 100% |
| HD Offshore | 5/30/00 | 100% |
| Quod Bonum BV | 8/17/00 | 80% |
| Prelude et Fugue | 9/20/00 | 100% |
| Poland.Com SA | 9/21/00 | 55.01% |

47. Messier's rapid growth strategy required Vivendi to finance the acquisitions, causing the Company to accumulate a massive amount of debt. For example, in March 1999, Vivendi financed its $6.2 billion acquisition of U.S. Filter by raising approximately €5.7 billion through a convertible bond offering. Similarly, in December 1999, Vivendi increased its equity investment in Elektrim Telekomunikacja ("ET"), a Polish conglomerate, to $1.2 billion (or 49% of ET's equity), by investing an additional $250 million in cash and converting an earlier $615 million loan into ET shares.

48.    By June 2000, Vivendi had significantly expanded and diversified its holding when it announced the massive €29.5 billion three-way Merger Transactions among Vivendi, Seagram (which owned Universal Studios and Polygram Records) and Canal+.  The Merger Transactions closed on December 8, 2000, and as the Company announced in its 2000 Annual Report:

> As a result of the Merger Transactions, we are one of the world's leading media and communications companies, with assets that include the world's largest recorded music company, one of the largest motion picture studios and film libraries in the world and leading businesses in the global telecommunications, television, theme park, publishing and Internet industries.  We believe that we will become a fully integrated global media and communications company capable of providing a diverse array of entertainment and information over wired and wireless access devices using cable, Internet, satellite and broadcast networks.

49.    According to press reports, the Merger Transactions "transformed the Company into the second-largest global media empire after AOL Time Warner."  *See*, "Vivendi Provides Critics Some Revenue Numbers To Chew On," *The New York Times*, Feb. 12, 2002.

50.    Following the Merger Transactions, many Wall Street analysts expected Vivendi to ensure that the newly merged and recently acquired businesses were achieving desired synergies before consummating any new acquisitions, as the Securities Class Action alleged.  Defendants, however, pursued a much different strategy.  In a span of just sixteen months after the massive three-way Merger, Vivendi acquired significant equity positions (or added to its existing equity positions) in the following companies, several of which Vivendi acquired outright:

| COMPANY | CLOSING DATE | INDUSTRY | % ACQUIRED |
|---|---|---|---|
| Maroc Telecom | 12/21/00 | Telecom Services | 35% |

20

21

51.    Like the pre-Merger Transactions acquisitions, the vast majority of these post-Merger Transactions acquisitions were paid for by using Vivendi stock as currency, or by borrowing against future earnings.  Thus, to sustain its growth by acquisition strategy, it was crucial for Vivendi and the Individual Defendants to continue to report favorable financial results

| | | | |
|---|---|---|---|
| USA Network Entertainment | 5/7/02 | Cable TV | 93% |
| Koch Group Recorded Music | 2/15/02 | Music | 100% |
| EchoStar Communications | 1/22/02 | Satellite Telecom | 10% |
| Multithématiques | 12/17/01 | Cable TV | 27% |
| Studio Canal | 10/12/01 | Motion Pictures Services | 14.8% (85.2% owned) |
| Mediabright | 9/12/01 | Applications Software | 100% |
| Elektrim Telekomunikacja | 9/4/01 | Telecom Services | 2% (49% owned) |
| MP3.Com | 8/28/01 | Internet Content | 100% |
| Houghton Mifflin Co. | 8/3/01 | Publishing | 100% |
| Scoot Europe NV | 7/27/01 | Broadcast Server | 50% (50% owned) |
| RMM Records & Video | 6/25/01 | Music | 100% |
| Emusic.Com Inc. | 6/14/01 | E-commerce | 100% |
| Editions Juris Service | 4/25/01 | Multimedia | 100% |
| GetMusic LLC | 4/25/01 | Internet Content | 50% (50% owned) |
| Uproar Inc. | 3/23/01 | Internet Company | 100% |
| HCCOM | 2/19/01 | Publishing | 100% |
| Medicine Publishing | 2/1/01 | Publishing | 100% |
| MUSIDISC | 1/31/01 | Multimedia | 0.98% (99.02% owned) |

to keep Vivendi's stock price artificially high and to maintain Vivendi's favorable credit ratings that were essential to support the Company's existing debt and its access to additional debt financing.

**B.      Vivendi's Use of Improper Accounting to Artificially Inflate its Stock Price**

52.      Throughout the Relevant Period, Vivendi made use of various types of improper accounting machinations that had the purpose and effect of materially misstating Vivendi's financial results, as more particularized below.

### 1.      Accounting Rules Applicable to Foreign Issuers

53.      During the Relevant Period, Vivendi filed financial statements with the SEC that were represented to have been prepared in conformity with GAAP in France ("French GAAP"). The SEC allows foreign issuers, such as Vivendi, to prepare their primary financial statements in accordance with a comprehensive body of GAAP other than U.S. GAAP, provided that an understanding of such financial statements is facilitated via reconciliation to U.S. GAAP. Specifically, Item 17 of the Instructions to Form 20-F requires that foreign issuers' "financial statements shall disclose an information content substantially similar to financial statements that comply with U.S. generally accepted accounting principles."

54.      Vivendi filed its 1999, 2000, 2001 consolidated annual financial statements with the SEC on Form 20-F and represented that the Company's financial statements had been prepared in conformity with French GAAP and purportedly reconciled to U.S. GAAP. In addition, Vivendi's 2001 Form 20-F represented that beginning in 2002 the Company's financial information would be reported on a U.S. GAAP basis and reconciled to French GAAP. Despite these representations, Vivendi deviated from U.S. GAAP in several material respects when it reported the results of its operations during the Relevant Period.

22

55.    GAAP are the fundamental principles, consisting of rules, procedures and conventions that are recognized by the accounting profession as essential and define accepted accounting practice at a particular time. As set forth in the Financial Accounting Standards Board's ("FASB") Statement of Concepts ("CON") No. 1, one of the fundamental objectives of financial reporting is that financial statements provide accurate and reliable information concerning an entity's financial performance during the period being presented. Specifically, CON No. 1, ¶42 states:

Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

56.    Further, Regulation S-X provides that financial statements filed with the SEC that do not conform to GAAP are presumed to be misleading and inaccurate. Defendants' representations that Vivendi's financial statements had been reconciled to U.S. GAAP were materially false and misleading because the financial statements materially distorted the Company's true financial performance, as described herein.

57.    The Company's financial statements for at least fiscal years 1999, 2000 and 2001 did not fairly and accurately represent Vivendi's financial position and operations and were materially false and misleading because, as more particularized below in Section IV.B, Messier and Hannezo manipulated the Company's reported financial results through a plethora of accounting practices that violated at least the following basic GAAP precepts:

    1.    That financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of

23

transactions, events, and circumstances that change resources and claims
to those resources (CON No. 1, ¶ 40);

2.     That financial reporting should provide information about how
management of an enterprise has discharged its stewardship
responsibilities to owners for the use of enterprise resources entrusted to it.
To the extent that management offers securities of the enterprise to the
public, it voluntarily accepts wider responsibilities for accountability to
prospective investors and to the public in general (CON No. 1, ¶ 50);

3.     That financial reporting should be reliable in that it represents what it
purports to represent -- that information should be reliable as well as
relevant is a central principle of accounting (CON No. 2, ¶¶ 58-59);

4.     That information is complete and nothing is left out that may be necessary
to insure that it validly represents underlying events and conditions (CON
No. 2, ¶¶ 79, 80);

5.     That conservatism be used as a prudent reaction to uncertainty to try to
ensure that uncertainties and risk inherent in business situations are
adequately considered (CON No. 2, ¶¶ 95, 97);

6.     That revenues and gains generally should not be recognized until realized
or realizable, and that revenues are considered to have been earned when
the entity has substantially accomplished what it must do to be entitled to
the benefits represented by the revenues (CON No. 5, ¶ 83); and

24

7.      That the costs of services be matched with, *i.e.*, recognized contemporaneously with, the recognition of revenues that resulted from the same transactions (CON No. 6, ¶ 145).

**2.      Defendants Failed to Timely Write Down Impaired Goodwill**

58.      During the Relevant Period, Vivendi's financial statements were materially false and misleading and were prepared in violation of U.S. GAAP and SEC rules and regulations because, *inter alia*, the Company failed to timely record an impairment in the value of its reported goodwill. In so doing, Vivendi misled investors about cash flows it expected to receive from certain of its recent acquisitions.

59.      "Goodwill" is an accounting term used to reflect the portion of the market value of a business entity that is not directly attributable to its assets and liabilities. When one company purchases another for more than its book value – *i.e.*, the amount of its assets minus its liabilities – it is required to record goodwill as an asset in its financial statements and to present it as a separate line item on its balance sheet.

60.      As noted above, prior to and during the Relevant Period, Vivendi engaged in an acquisition spree, which, in the aggregate, resulted in the acquisition of interests in other entities that Vivendi valued in excess of *$77 billion*. Vivendi utilized the "purchase method" of accounting for these acquisitions, in accordance with Accounting Principles Board ("APB") Opinion No. 16, *Business Combinations*, which sets the amount of goodwill to be recorded as follows:

The acquiring corporation records at its cost the acquired assets less liabilities assumed. A difference between the cost of an acquired company and the sum of the fair values of tangible and identifiable intangible assets less liabilities is recorded as goodwill.

ABP Opinion No. 16, ¶11.

25

65.    However, although Vivendi had recognized the initial €6 billion impairment to

goodwill under French GAAP in the fourth quarter of 2001 attributable to the Canal+

acquisition, Vivendi did not take *any* impairment to goodwill under U.S. GAAP until the first

quarter of 2002. The Company purported to explain this disparate accounting treatment in its

2001 financial statements:

> *Goodwill Impairment Charge and Impairment of Other Long-*
> *Lived Assets*
>
> As required under both French and U.S. GAAP, Vivendi Universal
> reviews the carrying value of long-lived assets, including goodwill
> and other intangible assets, for impairment at least annually or
> whenever facts, events or changes in circumstances, both internally
> and externally, indicate that the carrying amount may not be
> recoverable. Under French GAAP, measurement of any impairment
> is based on fair value. In 2001, following the recent market decline,
> particularly in the Internet, media and telecommunications industries,
> our annual review resulted in a non-cash, non-recurring goodwill
> impairment charge of €12.9 billion (€12.6 billion after €0.3 billion
> minority interest). Under U.S. GAAP, measurement of any
> impairment is based on the provisions of Statement of Financial
> Accounting Standards (SFAS) No. 121, Accounting for the
> Impairment of Long-lived Assets and for Long-Lived Assets to Be
> Disposed of (SFAS 121). *SFAS 121 requires that an impairment*
> *loss be recognized whenever the sum of the undiscounted future*
> *cash flows estimated to be generated from the use and ultimate*
> *disposal of an asset are less than the net carrying value of the asset.*
> *On this basis no impairment was indicated and accordingly the*
> *goodwill impairment charge was reversed.*

(emphasis added)

66.    Statement of Financial Accounting Standards ("SFAS 142"), *Goodwill and Other*

*Intangible Assets*, requires intangible assets, such as goodwill, to be reviewed for impairment in

accordance with SFAS 121, *Accounting For The Impairment Of Long-Lived Assets and For*

*Long-Lived Assets To Be Disposed Of*. SFAS 121 provides that an impairment loss shall be

recognized if the carrying amount of an intangible asset is not recoverable and if its carrying

amount exceeds its fair value. Specifically, SFAS 121 provides:

27

1.      An entity shall review long-lived assets and certain identifiable intangibles and goodwill related to those assets to be held and used for impairment *whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.* The following are examples of events or changes in circumstances that indicate that the recoverability of the carrying amount of an asset should be assessed:

a.      A significant decrease in the market value of an asset

b.      A significant change in the extent or manner in which an asset is used or of a significant physical change in an asset

c.      A significant adverse change in legal factors or in the business climate that could affect the value of an asset or an adverse action or assessment by a regulator

d.      An accumulation of costs significantly in excess of the amount originally expected to acquire or construct an asset

e.      A current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that *demonstrates* continuing losses associated with an asset used for the purpose of producing revenue.

(emphasis added). SFAS 121 expresses requires a goodwill impairment to be recognized if the

future cash flows expected to be generated by an asset are less than the carrying amount of an

asset. Accordingly, by not taking any write-offs for impaired goodwill under U.S. GAAP in

2000 or 2001, Vivendi essentially represented to investors that the cash flows Vivendi expected

to receive from Canal+ equaled or exceeded its carrying value. As set forth below, however,

Defendants knew, or recklessly ignored, that Vivendi did not expect to receive cash flows from

Canal+ equal to its carrying value long before it recognized goodwill impairments. Accordingly,

Defendants violated SFAS 121 by failing to write down impaired goodwill for Canal+ before the

first quarter of 2002.

67.     Specifically, well before the first quarter of 2002, Defendants knew that the value

of Canal+'s "smart cards" had been severely compromised by known piracy beginning at least as

28

early as March 1999.    As the Securities Class Action alleged, Canal+ filed a civil action against

NDS Group PLC ("NDS") in the United States District Court for the Northern District of

California in March 2002 (the "March 2002 Complaint"), which alleged that since March 1999,

NDS "permitted and facilitated the proliferation of counterfeit smart cards that enabled users to

circumvent the security measures built into the Canal+ conditional access system," causing

Canal+ to suffer losses over a billion dollars.  According to the March 2002 Complaint,

> Through the investment of millions of dollars and thousands of man-
> hours into research and development, Canal+ was able to implement
> effective security measures in its smart cards used to control access to
> digital television signals. *These measures proved to be more than
> adequate to protect Canal+ smart cards from piracy until March
> 1999, when Canal+ smart card software code was copied and
> published on a web site called "DR7.com." Thereafter, counterfeit
> Canal+ smart cards began to appear on the market.    The
> proliferation of these counterfeit cards resulted in massive harm to
> Canal+ and to the system operators who depend on the security of
> Canal+ smart cards...*
>
> *If smart cards pirates obtain Canal+ new software code, the
> damage to Canal+ will be irreparable.  What is released to the
> public cannot be put back in the bottle.  The market for counterfeit
> smart cards is massive and the harm from such activities is global.*

(emphasis added.)

68.    As Canal+ further alleged in the March 2002 Complaint:

> Canal+ seeks redress in this action for the damage caused by its
> competitor, NDS.  Through the calculated expenditure of millions of
> dollars for specialized equipment and other resources, NDS
> sabotaged C+ Technologies' [Canal+ Technologies'] previously
> unbroken security system for access to digital television signals.  In
> apparent disregard for both the law and its own reputation, NDS
> caused the development of counterfeit "smart cards," permitting a
> theft of digital television on a massive scale. *Canal+ estimates that
> Defendants' illegal conduct has caused it harm in excess of
> $1,000,000,000.*

\*    \*    \*

C+ Technologies has spent substantial time and money developing countermeasures to combat each type of pirate smart card that resulted from the publication caused by NDS. These countermeasures are created by a team of C+ Technologies engineers and then tested and broadcast by the digital television operators to stop unlawful television viewing by counterfeit card consumers. *The countermeasures, however, are quickly made obsolete by new versions of software for the counterfeit cards that pirate make available after analyzing the countermeasures. Counterfeiters are able to quickly and effectively respond to each new countermeasure because they have access to the UserROM code published on DR7.com.* C+ Technologies cannot stop this counterfeiting without implementing a fundamental change in the design of the smart card. At enormous expense, C+ Technologies is currently developing a new smart card design and will soon transition its existing network to the new design. This transition will be consuming and expensive because each and every legitimate smart card will have to be exchanged.

*The mass production of counterfeit C+ Technologies smart cards has damaged not only Groupe Canal+'s direct revenue through its digital television operators, but has also hurt the sales efforts of C+ Technologies and Canal+ USA. Conditional access system competitors, especially NDS, used the existence of counterfeit C+ Technologies cards as a competitive weapon in the sales process among content providers and system operators.* For example, Canal+ has encountered competitors, including NDS, pointing out to customers and potential customers in the United States and elsewhere throughout the world, the breach of C+ Technologies' security schemes as evidence that Canal+ cannot guarantee the integrity of its systems. In highlighting this supposed security breach, Defendants have deceptively failed to disclose that the breach exists solely because of Defendants' own unlawful sabotage.

*As a result of the counterfeiting, Canal+ has lost sales opportunities and has lost customers to its competitors.* NDS has also used the counterfeiting to attempt to disrupt Canal+' relationships with existing customers.

*Another loss occasioned by NDS to Groupe Canal+ is the loss of pay per view subscriptions.* One common type of counterfeit access is a modification of a legitimate smart card. These cards, commonly referred to as "MOSC" cards (i.e., "Modified Official Smart Cards"), are legitimate cards, sometimes with valid basic subscriptions, that have been altered so they grant their owners rights that they have not purchased. Some MOSC cards grant free access to upgraded

packages or to every subscription channel; other have a number of pay per view television "credits" for which the owner has not been paid. These cards did not exist before the publication on DR7.com and but for that publication they would have not have been produced. *The widespread use of MOSCs has caused Groupe Canal+ and pay television operators from the Canal+ group to lose revenues from premium programs as subscribers are able to have their smart cards altered to receive premium programs without paying for them.*

(emphasis added.)

69.    Similarly, according to the Securities Class Action, in a declaration filed on May 13, 2002 in connection with Canal+'s action against NDS, Jean-Marc Racine, the Director of Marketing for Canal+, and former CEO of Canal+, stated:

*[J]ust as Canal+ was getting a foothold in the U.S., the piracy of our conditional access system became known and Canal+' efforts to gain U.S. market share, based out of Milpitas and later Cupertino, were negatively impacted. A company's reputation, its market perception of the quality of its product is important in order to win new business, and the piracy of Media Guard had a negative impact on Canal+.*

I had several experiences with Canal+ customers that to me evidence the impact of the piracy of MediaGuard on Canal+' Northern California operations. For example, Canal+ Technologies, Inc. expended a great deal of resources trying to win a contract with Cablevision in New York. We lost this contract with NDS, and Cablevision told us that it was choosing NDS because NDS knew how to combat piracy better than Canal+. In another instance, I believe that NDS actively flaunted the hacking of Canal+' conditional access system when it was in competition with Canal+ to win a full end-to-end system contract from RCN, an over-builder based in Princeton, New Jersey, which has significant operations in major U.S. cities, including San Francisco. Canal+ Technologies, Inc.'s only real competition for the RCN business was NDS. Several times, RCN, which was in contact with NDS at the time, mentioned the piracy of MediaGuard that had occurred after our codes were published on DR7. *On May 29, 2001, RCN asked us to comment on several articles and other information contained on web sites regarding the hacking and counterfeiting of Canal+' smart cards.* . . This set of articles is extensive and had to take more than a few hours to prepare. It was sent by an RCN engineer who I believe was also in contact with NDS in this competition with Canal+. RCN

31

asked us to justify why there was a piracy problem with our smart cards and told us that NDS had a much better solution and no piracy problem in Europe. *RCN postponed their decision on selecting a supplier for a new end-to-end system, but I believe that the piracy problem caused confusion and created doubts at RCN about the performance and quality of Canal+ products. Since then, Canal+ Technologies, Inc. has successfully won only one contract in the United States,* WinFirst in Sacramento. As the piracy of MediaGuard became known, we have put management time and efforts into reassuring the customer. We had to set up a Security Committee and explain to the customer how to fight piracy, the legal actions taken in Europe, and the engineering steps that we would use and were using to combat piracy. These efforts would not have been needed if MediaGuard had remained secure. *The security problems associated with our conditional access system[s] have had a negative impact on the sales efforts in the United States of Canal+ Technologies, Inc. based in Cupertino.*

(emphasis added.)

70.    In addition, as the Securities Class Action alleged, on March 2, 2001, *New Media Markets* reported:

*Some estimates put the level of piracy as high as 30 percent of the pay-television subscriber base in Western Europe.*

\* \* \*

The impact of piracy was made clear last month by Spanish pay-television group Sogecable, which runs both the Canal Satelite Digital digital-satellite platform and the Canal+ España premium service. The company, which has just over two million subscribers, said that pirate cards were being used by between 100,000 and 300,000 homes in Spain. *This is hurting the premium channel and pay-per-view services in particular.*

(emphasis added.)

71.    Despite the foregoing, when Vivendi reported its results for the quarter ended March 31, 2002, the Company disclosed:

32

Canal+ Premium Channel revenue fell 3% in the quarter because of lower advertising revenue and lower subscription revenue owing to lower average analogue subscribers.

In truth, and in fact, Canal+ premium channel revenue was materially adversely affected by the undisclosed piracy of Canal+'s technology noted above. By failing to write down Canal+'s goodwill under U.S. GAAP until the first quarter of 2002, Defendants misrepresented that this known piracy had no effect on the Company's value and anticipated cash flow when this plainly was false. Accordingly, Defendants violated SFAS 121 by continuing to represent publicly that Canal+ was as valuable after this piracy (which Canal+ itself had estimated to cause harm in excess of $1 billion), as it was before this theft.

72.     Moreover, although Defendants caused Vivendi to belatedly record goodwill impairments totaling €16.6 billion in the first quarter of 2002 under U.S. GAAP, after having taken no impairment charges under U.S. GAAP in FY 2001, and defendants downplayed the significance of these write-offs by attributing them to the adoption of a new accounting standard, SFAS No. 142, that changed the practice for goodwill accounting.[2] By delaying any recognition of goodwill impairment under U.S. GAAP, until after Vivendi had adopted SFAS No. 142, Defendants avoided having to admit that Vivendi's expected cash flows from its acquisitions had been materially impaired well before its adoption of the new accounting standard.

73.     Tellingly, following Messier's and Hannezo's ouster, the Company recorded an additional €3.8 billion impairment in the value of Canal+'s goodwill at the end of the first half of 2002 under French GAAP, even though Canal+ had reported revenue growth of 8% during this

[2]    Prior to the June 2001 adoption of SFAS 142, companies were permitted to amortize goodwill over a period not to exceed forty years. SFAS 142 prohibited the amortization of goodwill and required companies to carry goodwill on their balance sheets as an asset.

period. The fact that Vivendi's new management took additional write-offs of Canal+'s goodwill during a period when its business was actually improving further evidences that the impairment should have been taken earlier.

(ii)  **U.S. Filter**

74.    Just as it did with Canal+, Vivendi similarly violated GAAP by failing to write down impaired goodwill for its U.S. Filter acquisition. When Vivendi acquired U.S. Filter in September 1999, it paid approximately 46 times U.S. Filter's 1998 earnings. As a result, Vivendi recorded approximately €4.6 billion in goodwill for U.S. Filter. However, Vivendi's reported goodwill on U.S. Filter was materially inflated during the Relevant Period because, inter alia, (a) Vivendi was misstating U.S. Filter's reported revenue by improperly recognizing all of the revenue expected to be earned on multi-year contracts at the contracts' inception, as set forth more fully below at Section IV.B.4, supra, and (b) because companies comparable to U.S. Filter were sold during the Relevant Period at prices that were significantly less than what Vivendi had paid for U.S. Filter. (For example, although Vivendi paid 46.5 times U.S. Filter's purported operating profit when Vivendi acquired it in September 1999, in 2001 the German conglomerate RWE purchased a comparable U.S. water company, American Water, for only about 16 times earnings before interest and taxes). These events and circumstances confirmed that U.S. Filter's goodwill was impaired under U.S. GAAP prior to the fourth quarter of 2001. In the end, Vivendi recorded a staggering €2.6 billion impairment in the value of U.S. Filter's assets, but, in violation of U.S. GAAP, did not record this impairment until the end of the fourth quarter of 2001.

75.    After Vivendi's board ousted Messier and Hannezo, Vivendi's new management implicitly admitted that the goodwill impairments that prior management had recognized for

34

entities other than Canal+ and U.S. Filter were also insufficient. For example, on August 14,

2002, Vivendi reported additional goodwill impairments (exclusive of those pertaining to

Canal+) totaling €7.2 billion on a French GAAP basis for the three months ended June 30, 2002.

By contrast, the Company's financial statements for the three months ended March 31, 2002

(prepared on a French GAAP basis) showed that no charge for goodwill impairment was

recognized during the March 31, 2002 quarter.

### 3.    Defendants Improperly Consolidated Vivendi's Balance Sheet

76.    In addition to the failure to timely write down impaired goodwill that resulted in

materially misstating Vivendi's financial results, Defendants also improperly consolidated

revenue from certain investments in which Vivendi possessed less than a 50% ownership

interest. This improper consolidation further inflated at least the Company's 1999, 2000 and

2001 revenues and operating income in violation of basic U.S. GAAP precepts.

77.    For example, Vivendi included in its consolidated financial statements for 1999,

2000 and 2001 the complete financial results of the French telecommunications company

Cegetel Group ("Cegetel"), and included in its 2001 consolidated financial statements the

complete financial results of the Moroccan telecommunications company Maroc Telecom S.A.

("Maroc Telecom"), despite the fact that Vivendi held only a minority interest in both

companies.

78.    GAAP permits the consolidation of related entities onto a company's balance

sheet when certain specific requirements are satisfied. Specifically, Accounting Research

Bulletin ("ARB") No. 51 provides:

The purpose of consolidated statements is to present, primarily for the
benefit of the shareholders and creditors of the parent company, the
results of operations and the financial position of a parent company
and its subsidiaries essentially as if the group were a single company

35

with one or more branches or divisions. There is a presumption that consolidated statements are more meaningful than separate statements and that they are usually necessary for a fair presentation when one of the companies in the group directly or indirectly has a *controlling* financial interest in the other companies.

(emphasis added.)

79.    U.S. GAAP, however, limits the circumstances under which such consolidation is proper. In general, majority control is a prerequisite for consolidation. ARB No. 51, as amended by SFAS No. 94, provides:

*The usual condition for a controlling financial interest is ownership of a majority voting interest, and, therefore, as a general rule ownership by one company, directly or indirectly, of over fifty percent of the outstanding voting shares of another company is a* condition pointing toward consolidation.

(emphasis added.) While majority control is typically required for consolidation, the Emerging Issues Task Force's ("EITF") Abstract No. 96-16 permits minority shareholders possessing certain rights to overcome the presumption that consolidation requires a majority voting interest in certain limited circumstances. Specifically:

The Task Force believes that minority rights (whether granted by contract or by law) that would allow the minority shareholder to effectively participate in the following corporate actions should be considered substantive participating rights and would overcome the presumption that the investor with a majority voting interest should consolidate its investee:

1.    Selecting, terminating, and setting the compensation of management responsible for implementing the investee's policies and procedures; [and]

2.    Establishing operating and capital decisions of the investee, including budgets, in the ordinary course of business.

EITF No. 96-16. While the Task Force noted that the above examples were merely illustrative and not necessarily all-inclusive, U.S. GAAP clearly limits the circumstances under which consolidation of entities in which a company owns less than 50% interest is permitted.

36

80.     In fact, APB 18, *The Equity Method of Accounting for Investments in Common*

*Stock*, provides special rules for accounting for an entity of which a company owns 20-

50% and over which the company has the ability to exercise significant influence. Specifically,

APB 18 provides:

> In order to achieve a reasonable degree of uniformity in application, the Board concludes that an investment (direct or indirect) of 20% or more of the voting stock of an investee should lead to a presumption that in the absence of evidence to the contrary an investor has the ability to exercise significant influence over an investee. *Under the equity method, an investor recognizes its share of the earnings or losses of an investee in the periods for which they are reported by the investee in its financial statements.* An investor's share of earnings or losses from its investment is ordinarily shown in its income statement as a single amount. The Board recognizes that determining the ability of an investor to exercise such influence is not always clear and applying judgment is necessary to assess the status of each investment.

APB 18 (emphasis added).

81.     Vivendi violated U.S. GAAP by consolidating into its financial statements the

results of Cegetel, in which it held only a 44% interest, into its own results for 1999, 2000 and

2001, and the results of Maroc Telecom, in which it held only a 35% interest, into its own results

for 2001. Vivendi should have accounted for these entities using the equity method of

accounting, rather than fully consolidating their complete financial results into Vivendi's own

financial statements.

82.     In addition, Vivendi violated SFAS 95, *Statement of Cash Flows*, by improperly

consolidating entities whose cash it could not access. Specifically, SFAS 95 ¶ 15 of provides:

> The information provided in a statement of cash flows . . . should help investors, creditors, and others to (a) assess the enterprise's ability to generate positive future net cash flows; (b) assess the enterprise's ability to meet its obligations, its ability to pay dividends, and its needs for external financing. . . .

37

Vivendi's disclosures concerning its cash flows, rather than helping investors to assess its ability

to generate positive future cash flows and its ability to meet its obligations, painted a materially

false picture of the Company's finances by including cash on its balance sheet that it had no right

to access.

83.    In addition, under French GAAP, exclusive control and the power to direct the

financial and operational policies of an enterprise is required in order to consolidate results.

Furthermore, French GAAP states that enterprises are *excluded* from consolidation where severe

and long lasting restrictions substantially call into question the control or influence exercised

over the enterprise.

84.    Vivendi did not possess controlling financial interest in, at least, Cegetel and

Maroc Telecom and therefore should not have consolidated the financial statements such

companies with its own.  Indeed, the Shareholder Agreement between Vivendi and Cegetel, as

described in Vivendi's 2000 Form 20-F, contained a key clause that blocked Vivendi from

making operating and capital decisions in the ordinary course of Cegetel's business.  The clause

states:

If all of BT, Mannesmann and Transtel dissent, we [Vivendi] cannot
cause Cegetel Group to:

-    create or acquire shares in any entity which Cegetel Group or
companies it controls hold less than 100% of the shares and
voting rights; or

-    subject to some exceptions, *acquire, dispose of, lease or loan
a material amount of assets* or significantly reduce or cease
*any material business operation.*

(emphasis added.)

85.    Further, with regard to Maroc Telecom, Vivendi disclosed in its 2001 Form 20-F

that:

38

In the course of the partial privatization of Maroc Telecom, Vivendi Universal was chosen to be a strategic partner in the purchase of an interest in Morocco's national telecommunications operator for approximately €2.4 billion. The transaction began to be consolidated in April 2001, at which time Maroc ETm began to be consolidated in the accounts of Vivendi Universal, as we obtained control through majority board representation and share voting rights. As a leader in Moroccan telecommunications, Maroc Telecom operates 1.2 million fixed lines, has 3.7 million GSM clients and generated revenues of approximately €1.4 billion in 2001.

86.    Vivendi also disclosed in its 2001 Form 20-F that no other shareholders or groups of shareholders exercise substantive participatory rights, which would allow them to vote to block decisions taken by Vivendi Universal.

87.    This disclosure and the consolidation of Maroc Telecom's 2001 results were false and misleading because Vivendi only owned 35% of Maroc Telecom, and because the remaining 65% was held by a single entity – the Moroccan government. The Moroccan government did not conduct its operations based on the views of Vivendi.

88.    These improper consolidations caused Vivendi to misstate materially its financial results. Specifically, the improper consolidation of Cegetel's results with the Company's caused Vivendi to overstate its reported revenues by €3.9 billion, €5.1 billion and €6.4 billion for the years ended 1999, 2000 and 2001, respectively, while Vivendi's reported revenues were overstated in 2001 by an additional €1.4 billion as a result of the improper consolidation of Maroc Telecom, bringing its total overstatement for the year to €7.8 billion. Further, the improper consolidation of Cegetel and Maroc Telecom caused Vivendi to overstate its operating income, earnings before interest, taxes, depreciation and amortization ("EBITDA"), cash flow provided by operating activities, and reported growth rates during these years.

89.    In so doing, Vivendi overstated its reported revenue, operating income and EBITDA and inflated its reported growth rates throughout the Relevant Period, providing a false

39

40

impression that Vivendi had much higher revenue and income than it actually did. In turn, these falsified financial results ensured that the Company's share prices and credit ratings remained artificially high. Further, by creating the false impression that the Company could readily access these entities' cash to use for its own purposes, the improper consolidation of Cegetel and Maroc Telecom helped Defendants to conceal Vivendi's burgeoning liquidity crisis.

90. When asked about the liquidity of the Company, Vivendi's CEO Jean-René Fourtou ("Fourtou"), who became Vivendi's interim-CEO after Messier was forced to resign on June 3, 2002, admitted in a June 26, 2002 conference call that "we do not have access to Cegetel and Maroc Telecom." In an August 14, 2002 conference call with investors, Fourtou further conceded that "Vivendi cannot access the cash flow generated by the companies [of which] it owns less than 50%."

### 4. Defendants Improperly Recognized Revenue

91. In addition to failing to write down impaired goodwill and improperly consolidating Cegetel and Maroc Telecom, Vivendi improperly recognized hundreds of millions of revenue from (at least) its U.S. Filter subsidiary in violation of U.S. GAAP.

92. It is a basic accounting maxim that revenue should not be recognized until it is (a) realized or realizable and (b) earned. *See CON No. 5, Recognition and Measurement in Financial Statements of Business Enterprises.* The conditions for revenue recognition ordinarily are met when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price is fixed and determinable, collectibility of the sales price is reasonably assured and when the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue. *Id.* Generally, revenue should not be recognized

until the earnings process is complete. *See* SEC Staff Accounting Bulletin ("SAB") No. 101; CON Nos. 2 and 5; SFAS No. 48; ARB No. 43; APB Opinion No. 10; and SOP 97-2.

93.    Further, SAB No. 101 provides that:

> Supply or service transactions may involve the charge of a nonrefundable initial fee with subsequent periodic payments for future products or services. The initial fees may, in substance, be wholly or partly an advance payment for future products or services. In the examples above, the on-going rights or services being provided or products being delivered are essential to the customers receiving the expected benefit of the up-front payment. Therefore, the up-front fee and the continuing performance obligation related to the services to be provided or products to be delivered are assessed as an integrated package. In such circumstances, *the staff believes that up-front fees, even if nonrefundable, are earned as the products and/or services are delivered and/or performed over the term of the arrangement or the expected period of performance and generally should be deferred and recognized systematically over the periods that the fees are earned.*

(emphasis added; footnotes omitted.)

94.    Vivendi's Form 20-F for the fiscal year ended December 31, 2001 expressly represented that the Company was following these rules with regard to revenue recognition, stating:

> *Revenues on public service contracts are recognized as services are provided.* Amounts billed and collected prior to services being *performed* are included in deferred revenues.

(emphasis added.)

95.    In contravention of these clear rules and Vivendi's stated revenue recognition policies, Vivendi, throughout the Relevant Period, improperly recognized anticipated revenue from multiyear public service contracts upon signing the contracts. As the Securities Class Action alleged, a former officer of U.S. Filter contended that Vivendi Environmental, through its U.S. Filter subsidiary, materially overstated its operating results by employing a practice

internally referred to as "booking backlog." Pursuant to such practice, Vivendi improperly recognized and reported *the entire dollar amount of long-term fixed price contacts as revenue upon the signing of the contract.* According to the complaint filed in the Securities Class Action, the former U.S. Filter officer stated that because of the illicit practice, U.S. Filter overstated revenue on major contracts *by as much as ten times.* In fact, Vivendi Environmental accounted for approximately 51% of Vivendi's reported revenues and operating income during the year ended December 31, 2001, with its U.S. Filter subsidiary reporting €1.32 billion in total revenue in 2000.

96.     Vivendi's financial statements were materially overstated during the Relevant Period as a result of Defendants' improper recognition of revenue on U.S. Filter in violation of GAAP. Indeed, according to the Securities Class Action, Vivendi's management directly or knowingly condoned and encouraged the process in which employees would improperly record revenue, thereby inflating reported revenue. Further, the term "booking to backlog" was a phrase that was widely used among U.S. Filter personnel, and the phrase was even included in monthly reports given to the Executive Board of Vivendi Environmental, according to the Securities Class Action.

### 5.     Defendants Improperly Inflated Canal+'s Assets

97.     In addition to the failure to timely write down Canal+'s impaired goodwill as discussed above, Defendants materially and improperly inflated the reported value of Canal+'s assets on Vivendi's balance sheet in other respects. Specifically, Vivendi reported as assets on its balance sheet €250 million in "marketing rights" that Canal+ purportedly acquired through contracts with five French football league clubs. However, as set forth below, the purported

43

"marketing rights" provided no economic benefit to Canal+ and, accordingly, could not properly be recorded as assets.

98. According to the Securities Class Action, after Vivendi acquired Canal+, Hannezo reviewed a memorandum dated January 29, 2001 that disclosed that the purported "marketing rights" Vivendi was recording as assets on its financial statement actually belonged to the football league, not to the five individual teams with which Canal+ had contracted. Accordingly, these "marketing rights" provided no economic benefit whatsoever to Canal+. Even though this memorandum flatly warned that recording these contracts as assets would put Vivendi in a "difficult" position with respect to U.S. GAAP reporting requirements, Defendants caused the Company to recognize these "marketing rights" as assets on its financial statements in violation of U.S. GAAP.

99. CON No. 6, *Elements of a Financial Statement*, defines "assets" as "*probable future economic benefits* obtained or controlled by a particular entity as a result of past transactions or events." (emphasis added). As set forth above, however, the "marketing rights" belonged to the football league, not the individual teams with which Canal+ had contracted. Accordingly, the "marketing rights" did not provide "probable future economic benefits" to Canal+ and were not "assets" within the meaning of CON No. 6. Vivendi recorded these rights as assets in its year-end financial statements for 2000, in violation of GAAP, which were filed with the SEC on July 2, 2001.

6. **Defendants Improperly Manipulated Vivendi's Reported EBITDA**

100. According to the SEC Action, in order to meet ambitious earnings targets, Vivendi, at the direction of its senior executives, improperly adjusted certain reserve accounts of its subsidiaries and made other accounting entries without supporting documentation and not in

conformity with U.S. GAAP. As the SEC Action alleged, during the Relevant Period, Vivendi and the Individual Defendants referred to these improper efforts to meet or exceed earnings targets as "stretching."

101.    At the time of the Merger Transactions, Vivendi and Messier predicted that the Company would generate annual EBITDA growth of 35% during 2001 and 2002. According to the SEC Action, in order to assure that Vivendi would reach that target, during 2001 Vivendi improperly adjusted various reserve accounts and prematurely recognized income in a manner that was not in conformity with U.S. GAAP, including, in certain instances, with SFAS No. 5, *Accounting for Contingencies.*

(i)    **Improper EBITDA Adjustments during the Second Quarter of 2001**

102.    As the SEC Action alleged, in late June 2001, Vivendi, Messier, Hannezo and other Vivendi executives became concerned that Vivendi's EBITDA growth for the quarter ended June 30, 2001 might not meet or exceed market expectations. As a result, Vivendi, at the direction of its senior executives, made various improper adjustments that artificially inflated Vivendi's EBITDA by almost €59 million, or 5% of the total EBITDA of €1.12 billion that Vivendi reported (excluding the results of the recently-acquired Maroc Telecom) for that quarter.

103.    According to the SEC, Defendants increased Vivendi's EBITDA primarily by causing Cegetel, in the weeks leading up to Vivendi's earnings release for the second quarter of 2001, to depart from its historical methodology for determining the level of its reserve for bad debts (accounts receivable) during the second quarter of 2001. That departure resulted in Cegetel taking a lower provision for bad debts during that quarter than its historical methodology required. *This improper departure caused Cegetel's bad debts reserve for the second quarter*

44

*of 2001 to be €45 million less than it should have been. As a result, Vivendi's overall EBITDA for that period was increased by the same amount.*

104.    Under U.S. GAAP, SFAS No. 5 precludes the use of reserves, including excess reserves, for general or unknown business risks, and the systemic or time release of reserves into income. Further, paragraph 23 of SFAS No. 5 states that an estimate of losses on accounts receivable "normally depend[s] on, among other things, the experience of the enterprise . . . and appraisal of the receivables in light of the current economic environment."

105.    According to the SEC Action, Cegetel reduced its provision for bad debts during the second quarter of 2001 without the level of documentation and analysis that was required. Further, the decision to take a lower provision for bad debts in the second quarter of 2001 occurred at a time when Cegetel was actually having *more difficulty* collecting on its bad debts, according to the SEC Action.

106.    In addition to taking a lesser bad debt provision in the second quarter of 2001, Cegetel also, at the direction of Vivendi's senior executives, improperly deferred to the third quarter of 2001 approximately €14 million in provisions for potential future payments and potential liabilities that Cegetel should properly have booked in the second quarter of 2001. Altogether, those adjustments at Cegetel totaled €59 million and according to the SEC Action, enabled Vivendi to show overall EBITDA growth of 35% for the second quarter of 2001.

107.    Those accounting adjustments at Cegetel were made without proper supporting documentation and as a result, Vivendi's reconciled U.S. GAAP financial statements (which incorporated Cegetel's results) were therefore not in conformity with the requirements of SFAS No. 5.

(ii)    **Improper Adjustments of UMG's EBITDA**

45

108.    According to the SEC Action, various improper adjustments to Vivendi's EBITDA also occurred in the third quarter of 2001, and primarily affected the results of its music division, UMG. These improper adjustments increased UMG's reported results for the quarter ended September 30, 2001 by at least €10.125 million, or approximately 4% of UMG's total EBITDA of €250 million for that quarter.

109.    The SEC Action alleged that Vivendi improperly increased UMG's results in order to reach a pre-determined EBITDA figure at UMG for the quarter ended September 30, 2001 of €250 million. At that level, UMG would have been able to show EBITDA growth of approximately 6% versus the same period in 2000, and to outperform its rivals in the music business.

110.    According to the SEC, Defendants caused at least two improper adjustments to be made to UMG's reported results in order to reach their €250 million EBITDA target. First, UMG prematurely recognized just over €3 million in deferred revenue that it received in connection with a contract between UMG and other parties, however, this payment would need to be refunded if Vivendi and the other parties to the contract failed to meet certain conditions by mid-December 2001. The recognition of this €3 million payment as income in the third quarter of 2001 was not in conformity with U.S. GAAP because those conditions were not met during the third quarter, and the payment remained refundable.

111.    Second, in late October 2001, Vivendi temporarily reduced the amount of corporate overhead charges it allocated to UMG by €7 million. This reduction in the corporate overhead charges equaled the exact amount of additional earnings that Vivendi's senior executives determined that UMG would need in order to reach €250 million in EBITDA for the quarter ended September 30, 2001, according to the SEC Action.

112. This overhead allocation was not in conformity with U.S. GAAP, specifically CON No. 6, *Elements of Financial Statements*, which states that allocations should be assigned and distributed "according to a plan or a formula." Further, SFAS No. 131, *Disclosures about Segments of an Enterprise and Related Information*, provides that amounts allocated to reported segment profit or loss "shall be allocated on a reasonable basis." During the third quarter of 2001, Defendants based the overhead allocation charged to UMG not on a plan or formula, but primarily on a desire to reach a predetermined, specific EBITDA target, according to the SEC Action. This conduct was not in conformity with either CON No. 6 or SFAS No. 131.

113. The SEC Action also alleged that both the corporate overhead adjustment and the premature recognition of the contract revenue occurred after UMG had submitted its accounts to Vivendi for the quarter. Moreover, these accounting adjustments to UMG's EBITDA were made without proper documentation and were not in conformity with U.S. GAAP. Vivendi incorporated these inflated results into the Company's financial statements, causing Vivendi's financial reports, press releases, and other market communications to be materially false and misleading, as alleged below in Section V.

### 7. Defendants Failed to Disclose Vivendi's 2% Interest in Elektrim Telekomunikacja

114. In 1999, Vivendi made a €1.198 billion investment in a joint venture with Elektrim Telekomunikacja ("ET") that gave the Company a 49% interest in a company that controlled Polish mobile telephone operator PTC and Polish cable operator Bresnan. On June 28, 2001, Vivendi announced a memorandum of understanding pursuant to which it would increase this stake from 49% to 51% via an additional €100 million investment.

115. According to the SEC Action, after this announcement, Vivendi learned that Poland's antitrust authorities would have to approve the acquisition, a process that could have

47