taken several months. Vivendi also learned that the market in general, and the credit rating agencies in particular, might react negatively to Vivendi's acquisition of additional ET shares.

The SEC Action alleged that, as a result, rather than directly purchasing the 2% interest in ET, Vivendi deposited $100 million into an investment fund administered by Société Générale Bank & Trust Luxembourg. That fund subsequently purchased a 2% stake in ET in September 2001.

116.    Vivendi did not disclose all material details about this transaction until 2003.

Instead, Vivendi's 2001 Form 20-F stated only the following concerning Vivendi's interest in ET:

> ET:
> Participation in Elektrim – In September 2001, Elektrim Telekomunikacja (ET), in which Vivendi Universal has a 49% interest, acquired all of Elektrim S.A.'s landline telecommunications and Internet assets.

117.    Vivendi failed to consolidate ET's results into its own in violation of ARB 51, *Consolidated Financial Statements*, SFAS 94, *Consolidation of All Majority-Owned Subsidiaries*, and APB No. 18, *The Equity Method of Accounting for Investments in Common Stock*. Notably, APB No. 18, required Vivendi to apply the equity method of accounting to its ET investment. Under APB No. 18, Vivendi was required to recognize its share of ET's earnings or losses in its financial statements.

118.    Unfortunately for Vivendi, ET, which it was not only permitted but required to consolidate under GAAP, was losing money instead of making it. In fact, according to the Norges Bank Action, Vivendi disclosed in its Forms 20-F that ET's net loss €31 million and €28 million in 2000 and 2001, respectively. To avoid having to record ET's losses on its own balance sheet, Vivendi flouted GAAP by opting simply to not consolidate ET. Vivendi overstated its income by failing to consolidate ET's results into its own following its acquisition of majority control of that entity.

48

**C.    Defendants Concealed Vivendi's Growing Liquidity Crisis**

119.    Vivendi's costly acquisitions left the Company cash strapped, creating a liquidity crisis that threatened its very survival.  In addition to the improper accounting discussed above, Defendants took active steps to conceal this growing liquidity crisis, hoping to thereby prop up the Company's stock and assure its continued access to financing.

120.    However, during the Relevant Period, Defendants also repeatedly made material misstatements and omissions concerning the Company's liquidity.  Unbeknownst to Plaintiffs, investors or the financial markets, and contrary to Defendants' repeated assurances that the Company was in strong financial condition, Vivendi's implementation of its growth-by-acquisition strategy caused it to overpay for businesses and saddled the Company with a huge debt burden that the operations of the acquired businesses could not satisfy.

121.    As a result, Vivendi was under great strain to meet its obligations in the ordinary course as they came due.  The causes of Vivendi's liquidity problems included the following:

**1.    Defendants Failed to Disclose Vivendi's Inability to Generate Expected Cash Flows from the Company's Costly Acquisitions**

122.    A number of Vivendi's most significant acquisitions, including, as set forth above, Canal+ and U.S. Filter, were not generating the expected revenue that would have been required to justify Vivendi's publicly-reported "goodwill." Defendants engaged in the improper accounting described above in an effort to conceal from Plaintiffs and the investing public that the cash flows from these massive and costly acquisitions were falling far short of expectations.

**2.    Defendants Failed to Disclose the Insufficiency of Vivendi's Working Capital**

123.    Further, Defendants failed to disclose the insufficiency of Vivendi's working capital. Item 5B of the Instructions to Form 20-F required Vivendi's to include "a statement by

49

the company that, in its opinion, the working capital is sufficient for the company's present

requirements, or, if not, how it proposes to provide the additional working capital needed." In

addition, Paragraph 49 of CON 1, *Objectives of Financial Reporting By Business Enterprises,*

provides:

> Financial reporting should provide information about how an
> enterprise obtains and spends cash, about its borrowing and
> repayment of borrowing, about its capital transactions, including
> cash dividends and other distributions of enterprise resources to
> owners, and about other factors that may affect an enterprise's
> liquidity or solvency.

CON 1 at ¶ 49. Defendants failed to comply with the Instructions for completing their Forms

20-F and violated CON 1 by, as set forth above, failing to disclose that (1) cash from Cegetel and

Maroc Telecom was not available to the Company, even though the results of these entities were

consolidated in Vivendi's financial results, and (2) the Cegetel current account—as described

below—severely impacted the Company's liquidity.

**3.      Defendants Failed to Disclose Certain Off Balance Sheet Liabilities**

124.     During the Relevant Period, Defendants misled investors about an off-balance

sheet liability that further threatened Vivendi's liquidity and ultimately cost Vivendi hundreds of

millions of dollars and impaired Vivendi's liquidity crisis. According to the Securities Class

Action, in late 2000 and 2001, Defendants wagered on the future success of the Company by

selling put options to raise cash to fund executive compensation. These put options obligated

Vivendi to purchase in the future at least 22.8 million of its own shares, or approximately 2% of

all outstanding Vivendi stock, at an average price of €69. Even as Vivendi's share price dropped

during 2001 and the first half of 2002, making it increasingly likely that the Company would

take a large loss on the options, Defendants continued to conceal the true nature and extent of

these liabilities, and to misrepresent Vivendi's true liquidity condition. Moreover, even when

Defendants finally made limited disclosures of its put obligations in the spring of 2002, the

disclosures were woefully inadequate. For example:

(i)     As the Securities Class Action alleged, after being criticized by the

French press for concealing the risk connected to the options, Vivendi claimed that defendant

Hannezo went over the put options with analysts at an accounting workshop March 6, 2002 in

Paris. However, as the May 1, 2002 edition of *The Wall Street Journal* reported, "*analysts who*

*were present or listened in said Vivendi glossed over the issue,*" [emphasis added] and Vivendi

admitted that discussion of the puts was "easy to miss" at the accounting workshop. Moreover,

the slide presentation from this workshop, belatedly filed with the SEC as an exhibit to Vivendi's

May 2, 2002 Form 6-K did not mention Vivendi's put obligations.

(ii)     On April 15, 2002, Vivendi disseminated its annual report on Form

6-K for FY 2001 which contained a translation of its 2001 year end financial statements. This

translation also made only vague reference to Vivendi's put obligations:

> In connection with the sale of puts on its shares, Vivendi Universal
> had a commitment, at December 31, 2001, to buy 19.7 million shares
> at exercise prices ranging from €60.40 to €80.00 in 2002 and 3.1
> million shares at an exercise price of €50.50 in January 2003.

Vivendi's annual report therefore did little to clarify the details of Vivendi's risks and obligations

in connection with the put options. For example, other than specifying that Vivendi could be

forced to purchase 3.1 million shares in January 2003, the report failed to inform investors of the

scope, if any, of the Company's obligations with respect to the puts after December 31, 2001.

The report also failed to comment on whether the options were likely to be exercised given the

decline in Vivendi's stock price, or their potential adverse impact on Vivendi's liquidity.

(iii)    On April 18, 2002 (as later reported on May 1, 2002 by *The Wall Street Journal*) Laura Martin ("Martin"), who headed Vivendi's investor-relations departments, sent an e-mail to selected analysts that purported to clarify Vivendi's obligations with respect to the put options:

In a sign that Vivendi itself was conscious it hadn't made clear enough the consequences of the put options, Laura Martin, who heads the company's investor-relations department, sent an e-mail to four analysts on April 18 spelling the put options out clearly.

In the e-mail, Ms. Martin said Vivendi had 18 million put options outstanding that the company sold to undisclosed parties for 12 euros each and that carry an exercise price of 69 euros. She estimated the impact on the company's balance sheet at 50 million euros to 1.2 billion euros. The e-mail went on to say that, though previously raised at the [March 6, 2002] accounting workshop, the put options "were easy to miss."

Still, Martin's "selective disclosure" failed to state the timetable for Vivendi's future obligations, preventing analysts and investors from making a reasonable assessment with regard to Vivendi's cash flow for the immediate future. In addition, Martin's range of potential liability was rendered meaningless by its impossibly large scope and failure to reference when the obligation would come due.

(iv)    It was therefore not until May 28, 2002, in its 2001 Form 20-F, that Vivendi began to inform investors about its true potential adverse effects ensuing from the put options:

Except for one put sold in 1998, Vivendi Universal in 2001 sold puts to banks on 19.7 million ordinary shares at exercise prices ranging from €60.40 to €80.00 in 2002 and 3.1 million ordinary shares at an exercise price of €50.50 in January 2003. As of April 30, 2002, approximately 16 million of these puts remain outstanding. . . .

Vivendi Universal's contingent liability relating to these puts is approximately €1.1 billion to settle the 16 million puts outstanding for cash at an average of €69 per put and approximately €540 million

52

to settle the 16 million puts outstanding for cash by paying the banks the difference between the average of €69 per put and the market price per ordinary share of Vivendi Universal as of April 30, 2002.

A later June 7, 2002 article in the *Economist* reported that Hannezo had confirmed that Vivendi was using cash each month to buy out the costly put options.

(v)    In its 2002 half year financial statements released August 14, 2002, Vivendi disclosed the impact its put obligations had during the first six months of 2002 alone:

As at June 30, 2002 and December 31, 2001, Vivendi Universal had outstanding obligations on 13.9 million and 22.8 million shares respectively. The average exercise prices were €69 and €70 respectively, giving a potential commitment of €953 million and €1,597 million respectively. These put options are only exercisable on the specific date of the option and expire at various dates during 2002 and the first quarter of 2003.

*      *      *

The cost to Vivendi Universal during the first half of 2002 by option holders exercising their rights amounted to €239 million.

4.    **Defendants Failed to Disclose Acceleration Clauses in Vivendi's Loans**

125.    Further, Vivendi failed to disclose that maturity dates on major loans would accelerate in the event of a downgrade in Vivendi's credit rating. Specifically, according to the Norges Bank Action, an acceleration clause in one of Vivendi's loan agreements provided that it could be required immediately to settle €3.5 billion worth of "return swap" derivative transactions if its credit rating were to slip.

126.    Vivendi violated the SEC's Instructions for filing Forms 20-F by failing to disclose these acceleration clauses. Item 5B of the Instructions to Form 20-F required the Company to disclose "information on the level of borrowings at the end of the period under review, the seasonality of the borrowing requirements and *the maturity profile of borrowings and committed borrowing facilities, with a description of any restrictions on their use*." Item

53

5.B(1)(c) (emphasis added). Vivendi failed to disclose a very significant restriction on its use of the funds it had borrowed—namely, that it could be required to return immediately all amounts outstanding if its credit ratings slipped.

**5.    Defendants Failed to Disclose Material
Commitments Concerning Cegetel and Maroc Telecom**

127.    According to the SEC Action, in key meetings with analysts from Moody's Investors Services ("Moody's") and Standard & Poor's in December 2001, and in its Forms 20-F for 2000 and 2001, Defendants failed to disclose future commitments regarding Cegetel and Maroc Telecom that would have revealed grave doubts about the Company's ability to meet its cash needs.

(i)    Cegetel's Current Account

128.    In the summer of 2001, Defendants caused Vivendi to enter into an undisclosed current account with Cegetel, its most profitable and cash-flow positive subsidiary. Under this current account—which operated in much the same manner as a loan—Cegetel delivered excess cash to Vivendi on a short-term basis beginning in August 2001. Vivendi paid Cegetel a market rate of interest and agreed to return the funds at the expiration of the current account agreement on December 31, 2001.

129.    As the SEC Action alleged, Vivendi maintained cash pooling arrangements with most of its subsidiaries, it treated the funds it received from Cegetel differently than it treated these other pooling arrangements. In addition to the specific December 31, 2001 expiration date, the Cegetel current accounts contained an "on demand" clause that entitled Cegetel to demand immediate reimbursement of the funds it deposited with Vivendi at any time.

130.    According to the SEC Action, Cegetel gave Vivendi approximately €520 million

pursuant to the current account in August 2001. This account balance ballooned between

September 2001 and June 2002, at times exceeding €1 billion. Vivendi used the money Cegetel

gave it under the current account to pay for ordinary operating expenses.

131.    Cegetel's right to demand immediate reimbursement of the funds it provided to

Vivendi under the current account had a direct impact on the Company's liquidity. Vivendi,

however, declined to disclose the existence of this account in its 2001 Form 20-F. Item 5B(1)(b)

of the instructions for filing Form 20-F, *Liquidity and Capital Resources*, required Vivendi to

include in its financial statements the nature and extent of any legal or economic restrictions on

the ability of subsidiaries to transfer funds to the Company and to disclose the impact such

restrictions have had or are expected to have on its ability to meet its cash obligations. Vivendi

failed to make the required disclosure in violation of Item 5B(1)(b).

132.    Similarly, Vivendi's failure to disclose the current account violated Item 303 of

SEC Regulation S-K. Item 303 requires issuers to identify any known "demands, commitments,

events or uncertainties that will result in or that are reasonably likely to result in the registrant's

liquidity increasing or decreasing in a material way." Vivendi violated Item 303 by failing to

disclose the Cegetel current account.

133.    In addition to violating SEC regulations, Vivendi violated U.S. GAAP by failing

to disclose the Cegetel current account. Paragraph 2 of SFAS 57, *Related Party Disclosures*,

provides:

Financial statements shall include disclosures of material related
party transactions, other than compensation arrangements, expense
allowances, and other similar items in the ordinary course of business
. . . The disclosures shall include:

a.    The nature of the relationship(s) involved;

55

56

b.    A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;

c.    The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; and

d.    Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

Transactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist. Representations about transactions with related parties, if made, shall not imply that the related party transactions were consummated on terms equivalent to those that prevail in arm's-length transactions unless such representations can be substantiated.

(emphasis added). Vivendi violated SFAS 57 by failing to disclose the Cegetel current account.

(ii)    **The Maroc Telecom Side Agreement**

134.    In February 2001, Vivendi entered into a side agreement with Maroc Telecom to purchase an additional €1.1 billion stake in that entity. Defendants failed to disclose this side agreement.

135.    As discussed in Section IV.B above, Vivendi acquired a 35% stake in Maroc Telecom in December 2000. As the SEC Action alleged, in February 2001, Vivendi entered into a side agreement with the Moroccan government that required the Company to purchase an additional 16% of Maroc Telecom's shares in February 2002 for approximately €1.1 billion. In return, the Moroccan government granted Vivendi certain management rights over the Telecom's operations that Vivendi used to justify its consolidation on the Company's financial statements.

This side agreement was not disclosed in Vivendi's public filings in 2001 and early 2002. By

failing to disclose this €1.1 billion liability, Defendants were able to conceal Vivendi's

burgeoning cash crunch and were able to keep the Company's stock prices and credit ratings at

artificially high levels during the Class Period.

**6.    Defendants Failed to Disclose Vivendi's 2001 Stock Buybacks**

136.    Further exacerbating Vivendi's cash flow situation was defendant Messier's

undisclosed and massive stock buy-back program, which -- unbeknownst to Plaintiffs and

investors -- caused the Company to spend approximately $6.3 billion of the Company's cash on

acquiring Vivendi shares.  As later reported in *The Wall Street Journal* on October 31, 2002:

Mr. Messier, a former top investment banker with Lazard LLC, was
famously fond of deal making. But now it turns out he pursued many
more deals than has been publicly known. *More important, he spent
billions of dollars buying back Vivendi stock on the market last year
without consulting his CFO or the board, according to people
familiar with the situation. Trying to prop up the stock price, he
instead only sent Vivendi's debt soaring.*

*       *       *

The board signed off on Mr. Messier's acquisitions. But it did so
without knowing the full extent of his spending spree, current and the
board about his single biggest expenditure: the purchase of 104
million Vivendi shares, or nearly 10% of the company's equity, on the
stock market during 2001. His purpose was to prop up the she price.
The cost: $6.3 billion.

Shareholders had earlier approved a resolution allowing Vivendi to
buy back up to 10% of its shares. But current and former directors
say they expected to hear beforehand about such massive purchases.

*       *       *

Mr. Hannezo opposed the stock purchases as a waste of cash . . . .
This resulted in Mr. Messier trying to circumvent his CFO on the
buybacks. The ex-chairman placed his stock orders by phone the two
mid-level employees in the finance department, Hubert Dupont

Lhotelain and Francois Blondet, according to a person familiar with the matter . . . .

In early December 2001, the CFO finally intervened by forbidding his subordinates to take Mr. Messier's phone calls, the person familiar with the situation says Mr. Hannezo set up a formal process to slow Mr. Messier down, requiring that the chairman request buybacks in writing, along with some justification.

\*        \*        \*

By December, the buybacks had taken their toll: Vivendi was running out of cash, according to Mr. Hannezo's memo to the COB.

(emphasis added.)

7.    **Magnitude of the Undisclosed Liquidity Crisis**

137.    As subsequently reported on October 31, 2002 by *The Wall Street Journal* in an

article entitled "How Messier Kept Cash Crisis at Vivendi Hidden For Months: Media Giant Was

At Risk Well Before Investors Knew," Vivendi's acquisition spree, together with the other

factors referenced in the preceding paragraphs, had put Vivendi on the brink of financial

collapse:

On Dec. 13, [2001], Guillaume Hannezo sent Jean-Marie Messier, chairman of Vivendi Universal SA, a desperate handwritten plea.

"*I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat,*" wrote Mr. Hannezo, the company's chief financial officer. "*All I ask is that all of this not end in shame.*"

That very day, unknown to investors and the Vivendi board, the company had narrowly averted a downgrade by credit-rating agencies, which would have made it difficult to borrow money and plunged the company into a cash crisis. Mr. Hannezo (pronounced AN-ZO) implored his boss and longtime friend to take serious steps to reduce Vivendi's ballooning debt.

When the company's board met the next day to consider whether to approve a roughly $10 billion acquisition of USA Networks Inc.'s TV and film businesses, Mr. Messier made no mention of the close call with the rating agencies. Instead, when a director asked about

58

***Vivendi's financial profile, Mr. Messier said the company had no problem, according to two directors who were there.***

The board endorsed the USA Networks deal, buying Mr. Messier's pitch that it would help complete Vivendi's transformation from a onetime water utility into an entertainment giant. He boasted that the company would be able to distribute the movies and music made by its Universal Studios and Universal Music units by means of cellular devices, as well as by satellite, cable and pay television.

But Vivendi was already in dire financial straits. The USA Networks deal, along with a $1.5 billion investment in satellite-TV operator EchoStar Communications Corp., in fact signaled the beginning of the end for Mr. Messier. The boy wonder of the French business establishment was ousted seven months later in July, after directors discovered the company was skirting close to a bankruptcy filing.

As new management struggles to salvage the French conglomerate, it has become clear that Vivendi came close to financial disaster far earlier than previously thought. *That picture is starkly at odds with the one repeatedly presented by Mr. Messier to investors and his board.*

(emphasis added.)

138.    Similarly, citing an article first appearing in *Le Monde*, Bloomberg reported on May 14, 2002 that Vivendi was close to insolvency at the end of 2001:

Vivendi Universal SA, the world's second-largest media company, was close to insolvency at the end of 2001 after delays in planned asset sales, French daily Le Monde said, without citing anyone.

Delays in the sale of the Seagram liquor unit and a French magazine business caused a "serious cash crisis" at the Paris-based company, which faced payments of about 10 billion euros ($9 billion) at the end of last year, the paper said. Today, Vivendi's business "barely produce the cash needed to pay the bills," according to the report . . .

Vivendi's cash woes help explain why the company sold 55 million of its own shares in January, 9 percent of Vivendi Environnement SA, as well as its stake in AOL Europe and British Sky Broadcasting Plc, Le Monde said. Since the beginning of the year, Vivendi shares have lost half their value.

139.    Although Defendants denied any pending liquidity crisis in response to the *Le Monde* report and reassured investors during the spring and early summer of 2002 that Vivendi could meet its obligations for the next 12 months, in reality the Company continued to teeter on the edge of bankruptcy.

140.    Similarly, on September 27, 2002, the AFX News reported:

> Vivendi Universal chairman Jean-Rene Fourton said the company would have been forced to declare bankruptcy within 10 days if Jean Marie Messier had not resigned, according to a report in Le Figaro.

141.    On December 13, 2002, the *Associated Press* reported, based on an article first appearing in *Le Monde*, that defendant Hannezo admitted that 2001 was marked by a series of errors, including underestimating the debt problem:

> Electronic mail seized in an investigation of alleged financial irregularities at Vivendi Universal and other documents show escalating tension amid a growing debt crisis that led to the fall of flamboyant Chairman, Jean-Marie Messier.
>
> Board member Edgar Bronfman Jr. of Canada's Seagrams empire, which was purchased by Vivendi in 2000, warned Messier in an e-mail that he could be courting danger with his "very costly personal shows," according to Friday's edition of the newspaper Le Monde.
>
> And former Financial Director Guillaume Hannezo, in a note to France's stock exchange watchdog, said Messier had turned Vivendi into a "permanent deal machine," while an "urban guerrilla atmosphere" gripped a divided board, the newspaper said.

*       *       *

> Hannezo, the former finance director, said in his 20-page report to the COB that 2001 was marked by the "accumulation of a series of errors," including underestimating that the debt problem, according to Le Monde.

*       *       *

> Hannezo, a key figure in the COB investigation, speculated that Vivendi could have been spared its debt mountain in 2001 "had it resolved to sell before buying . . . Unfortunately, it oriented itself

60

toward the inverse choice, satisfying itself with potential riches," he wrote. Vivendi's shares have tumbled around 75 percent this year.

### D.    The Truth Begins to Emerge

142.    On May 3, 2002, Moody's downgraded Vivendi's long-term debt rating to Baa3, just one level above the "junk" status assigned to speculative investments. Moody's attributed the ratings drop to concerns that Vivendi might not be able to reduce its debt load as quickly and comprehensively as the Company had planned.

143.    In response to the ratings downgrade, Vivendi issued a press release which contended that Moody's purportedly failed to consider the poor market conditions or the full extent of Vivendi's debt reduction program.  In a Form 6-K that Vivendi issued that same day, Defendants tried to assure the market that Moody's downgrade would have no adverse affect on Vivendi, stating:

> This decision has no impact on Vivendi Universal's cash situation. It does not trigger any renegotiation clauses or advance repayments of bank credit lines. In addition, Vivendi Universal's use of commercial paper in the current amount of 1.6 billion euros is well covered by back-up lines of more than 3 billion euros, the availability of which will not be affected by the rating change.
>
> Vivendi Universal affirms that it has every confidence in its ability to meet its operating targets for 2002, as proved by its first-quarter results. The company is totally determined to carry through its debt reduction program in order to make to make a rapid return to a comfortable position with a Baa2 rating.

Despite the Company's effort to reassure the market, Vivendi's ADSs dropped $1.74, from $30.76 to $29.07, in response to Moody's rating downgrade. The Company's ordinary shares suffered similar declines, dropping from €33.77 to €31.52.

144.    By May 29, 2002, with Vivendi's ADSs trading in the $29 to $30 range and its ordinary shares trading in the €31 to €33 range in response to concerns about its debt levels,

61

Defendants sought to reassure the financial markets by issuing a press release (also filed on a Form 6-K) reflecting a May 29, 2002 board meeting. The press release stated that Vivendi's board had "carried out a detailed examination of Vivendi Universal's operating and financial targets for 2002." According to the press release, the board stated that their strategy was "based on the active continuation of the debt reduction program and the internal growth of the company's businesses." Messier was quoted as follows:

Our Board of Directors and management are proceeding together, deliberately and decisively, to execute a plan that, in meeting our financial targets and operating objectives, will deliver increased value and solid growth to our Company. I look forward to the recommendations of our newly created governance committee, which, I believe, will have an added contribution by continuing to improve the structures and procedures that insure an absolute and impartial focus on the Board's fiduciary duty to stakeholders.

145.     While the Company sought to assure investors that it was not facing a liquidity crisis, rumors that Vivendi was in danger of default on its credit facilities persisted. On July 2, 2002, Vivendi's debt was downgraded for a second time. This announcement caused Vivendi's ADSs to plummet nearly 21%, falling from $22.45 to $17.76, while its ordinary shares fell more than 25%, from €23.90 to €17.80. The Company's shares dropped so rapidly that the Paris Bourse repeatedly suspended trading in the embattled conglomerate's ordinary shares.

146.     Vivendi swiftly ousted Messier the following day, and admitted that the Company was facing a "short-term liquidity issue." Vivendi disclosed that it would be required to repay creditors €1.8 billion by the end of July 2002 and that €3.8 billion in credit lines were up for renegotiation. Further, credit analysts estimated that Vivendi could face a cash shortfall of €2.7 billion by the end of 2002 – an amount they feared could expand to €5.5 billion in the middle of 2003 if the Company failed quickly to secure new multibillion-euro lines of credit. These announcements caused the Company's ADSs and ordinary shares to fall even further, dropping

nearly another 12% on July 3, 2002 from $17.76 to $15.66 and nearly another 22% from €17.80

to €13.90, respectively. All told, the Company's ADSs and ordinary shares fell a stunning 30%

and 41.8%, respectively, in the two days following the second credit rating downgrade.

147.    According to the Norges Bank Action, on July 5, 2002, *The Globe and Mail*

*Metro*, a Canadian newspaper, reported that Vivendi "finally admitted what its ousted chairman

and chief executive officer, Jean-Marie Messier, had strenuously denied in recent weeks: The

media-and-utility conglomerate is in danger of a cash crunch." *The Globe and Mail Metro*

further stated:

> Based on a detailed liquidity statement Vivendi put out late
> Wednesday, credit analysts estimate that Vivendi could face a cash
> shortfall of 2.7 billion euros ($2.64 billion U.S.) by the end of the
> year, expanding to as much as 5.5 billion euros by the middle of
> 2003, unless it can quickly secure a new multibillion-euro credit line
> from its lenders.

* * *

> In its statement, Vivendi said it must repay 1.8 billion euros this
> month and said the payment would be financed from 2.4 billion euros
> in existing cash and credit lines. It also has a 3.8-billion-euro credit
> line that will roll over this month unless the banks determine there
> has been a "material adverse change" with the company.
>
> This grim outlook contrasts with Mr. Messier's recent assurance that
> the "treasury situation" at Vivendi--owner of Universal Studios,
> Universal Music Group, USA Networks and minority stakes in a host
> of other assets--was "comfortable even in the most pessimistic market
> hypotheses."

148.    On July 10, 2002, *The Wall Street Journal* reported that the COB had raided

Vivendi's Paris headquarters as part of a formal investigation into the Company's financial

disclosures going back to 2001. The French investigation had been opened to look into alleged

"publication of false balance sheets for the tax years closing December 31, 2001 and December

63

31, 2002" and the publication of false and misleading information concerning the Company's

financial outlook for those years.

149.    On July 16, 2002, Vivendi announced that Hannezo was relieved of his CFO

duties at Vivendi and would stay with Vivendi for six months as an advisor to the new chairman.

A July 17, 2002 research report by BNP Paribas Equities stated:

This is no surprise. Guillaume Hannezo was very close to Jean-Marie
Messier. *The group's financing packages and strategy were as
much his as Messier's.*

(emphasis added.)

150.    Unfortunately for Vivendi's investors, the stunning collapses of early July 2002

only foreshadowed drops still to come.

151.    On August 14, 2002, the Company's new management held a conference call and

issued three press releases (filed with the SEC on Forms 6-K) informing the public of just how

dire Vivendi's financial situation had become.

152.    The first press release memorialized the August 14 conference call. In it, Fourtou

stated that:

In the short term, due to the structure of our debt, we are facing a
liquidity problem ... in spite of the value of our assets. That's why
the first thing I did upon my arrival was to negotiate ... a new bank
facility of 1 billion euros. This new money has not yet been used. As
announced in July, we are presently negotiating a new facility of 3
billion euros which will include the first 1 billion euros. We have
reached a framework for agreement with the same seven banks and
we expect this new facility to be signed by the end of August. This
will allow Vivendi to buy the time necessary to implement the best
conditions for the necessary sale of the businesses. ...

153.    The second August 14 press release reported on a August 13, 2002 Board meeting

and announced that the Board had, among other things, approved a plan to dispose of at least €10

billion worth of assets, including €5 billion in the next nine months; voted to sell Houghton

64

Mifflin Co.; and authorized the cancellation of 20,865,167 treasury shares linked to certain stock

option plans.

154.    The final August 14 press release and Form 6-K announced Vivendi's results for

the first half of 2002, and reported that "[n]et income was a loss of 12.3 billion euros,

representing negative 11.32 euros per basic share, for the first half of 2002." Further, the press

release highlighted the €11 billion goodwill impairment charge and the "financial provisions of

3.4 billion euros" that were recorded at June 30, 2002.  Net income was negative €66 million, "or

negative 0.06 euros per basic share in the first half of 2002 compared with positive 0.27 euros

earnings per basic share in the 2001 period."  Debt under French GAAP was approximately €35

billion.  The Board also laid out its commitment to "raising at least 10 billion euros through asset

sales during the next two years, 5 billion euros of which will be completed during the next 9

months."

155.    In response to the news, debt-rating agency Standard & Poor's slashed Vivendi's

long-term corporate credit that same day and warned of a further downgrade if Vivendi could not

secure new funding within a month.  Fourtou was quoted by the Associated Press on August 14,

2002 as stating: "'We are facing a liquidity problem, [and I will] try to avoid any fire sale, but we

have negotiations that could be concluded very soon if the price was lowered."  The news report

also stated:

Vivendi Universal, the teetering French media conglomerate,
reported a massive loss of $12 billion for the first half of the year and
said it will sell $10 billion in assets as it seeks to pare debt, including
the U.S. publisher Houghton Mifflin.  Adding insult to injury, a
ratings agency downgraded the company's debt to junk.

The sale of Houghton Mifflin, which the company only bought last
year for $1.7 billion, appeared to mark a first step toward breaking up
the entertainment and media empire built up by Vivendi's former
chairman, Jean-Marie Messier, in a whirlwind of costly acquisitions.

65

In all, Vivendi said it hopes to dispose of at least $9.8 billion worth of assets - half of them within nine months, the rest within two years.

156.    In response to these developments, on August 14, 2002, Vivendi ordinary shares closed at €11.89, down more than €4 (or approximately 25%) from its close the previous day. Vivendi's ADSs suffered a similar decline, closing down $3.67 at $11.66.

157.    In the wake of the public admission that the Company was facing a cash crunch, Vivendi's new management set about the process of raising revenue by jettisoning some of the conglomerate's major assets. Media reports indicated that the Company had enough cash to last only until October 2002, putting Vivendi in a dire position. In response, Vivendi announced an ambitious plan to shed €16 billion in assets between July 2002 and the end of 2004. As the Norges Bank Action alleged, Vivendi's "garage sale" included the following dispositions:

| Date | Disposition | Price |
| --- | --- | --- |
| July 2002 | B2B/Health | €150 million |
| July 2002 | Lagardère | €44 million |
| July 2002 | Vinci | €629 million |
| December 2002 | Vizzavi | €143 million |
| December 2002 | Houghton Mifflin | €1.567 billion |
| December 2002 | VUP publishing activities in Europe | €1.138 billion |
| December 2002 | Veolia Environment | €1.865 billion |
| December 2002 | EchoStar | €1.037 billion |
| December 2002 | Sithe Energies, Inc. | €319 million |
| February 2003 | Consumer Press division | €200 million |
| February 2003 | Canal+ Technologies | €191 million |
| April 2003 | Telepiù | €831 million |

99

| May 2003 | Fixed-line telecommunication in Hungary | €315 million |
| May 2003 | Comareg | €135 million |
| May 2003 | Interest in Vodafone Egypt | €43 million |
| June 2003 | InterActive Corp. warrants | €600 million |
| June 2003 | Interest in Sithe International | €40 million |
| June 2003 | VUB real estate | €276 million |
| October 2003 | Canal+ Nordic | €48 million |
| February 2004 | Atica & Scipione | €31 million |
| March 2004 | Sportfive | €274 million |
| May 2004 | Vivendi Universal Entertainment | €2.312 billion |
| May 2004 | Kencell | €190 million |
| June 2004 | Monaco Telecom | €169 million |
| June 2004 | Egée and Cédric Towers | €84 million |
| August 2004 | Interests in VIVA Media | €47 million |
| September 2004 | Canal+ Group headquarters | €108 million |
| October 2004 | UCI Cinemas | €170 million |
| December 2004 | 15% of Veolia Entertainment | €1.497 billion |

In sum, Vivendi unloaded over €15 billion in assets between July 2002 and December 2004.

158.    On October 30, 2002, Vivendi announced that Paris's public prosecutor's office had opened an investigation into the veracity of the Company's financial disclosures. A few days later, the Company announced that a separate investigation had been opened by the U.S. Attorney's Office for the Southern District of New York. The U.S. Attorney announced that it

89

planned to coordinate its efforts with the SEC, which had already begun to conduct an informal inquiry into Vivendi.

159.    On November 20, 2002, the SEC announced that it had upgraded its inquiry into Vivendi from an informal inquiry to a formal investigation. The SEC made clear that it intended to review Vivendi's accounting and the veracity of its public disclosures. In connection with these enforcement efforts, the SEC in September 2003 obtained a court order forcing Vivendi to place in escrow $23 million it had earmarked to pay a severance package Messier negotiated just before his ouster. Messier was similarly barred from executing a judgment he had obtained via an arbitration in New York State Court concerning this severance package.

160.    On September 15, 2003, the COB – following a fourteen month investigation – announced its conclusion that Vivendi had made false financial disclosures. Among its failures, the COB found that Vivendi had not disclosed to investors the growing cash problems it faced during the end of Messier's tenure.

161.    The United States-based investigations into the crisis engendered by Messier's $77 billion acquisition spree came to a stunning conclusion on December 24, 2003. That day, the SEC filed and simultaneously settled securities fraud charges against Vivendi, Messier and Hannezo, imposing fines totaling $51 million. The SEC charged Vivendi, Messier and Hannezo with multiple violations of the federal securities laws committed between December 2000 and July 2002. Specially, the SEC contended that these parties had engaged in a course of fraudulent conduct that disguised the Company's cash flow and liquidity problems, improperly adjusted accounting reserves to meet predetermined EBITDA targets, and failed to disclose material commitments at Cegetel and Maroc Telecom.

69

162.    In addition to the massive fines imposed against them, Messier and Hannezo both
entered into consent decrees permanently enjoining them from further violations of the federal
securities laws and barring them from service as officers or directors of any public companies for
respective ten and five year periods.

163.    On January 18, 2006, the Company announced plans to discontinue its ADS
program, citing concerns over the costs of complying with U.S. disclosure requirements.

## V.    FALSE AND MISLEADING STATEMENTS

164.    On October 30, 2000, Vivendi filed a Form F-4 (the "Form F-4") with the SEC,
which Defendants Messier and Hannezo signed, in connection with the Merger Transactions.
The Form F-4 presented Vivendi's historical financial statements for fiscal year ended December
31, 1999 and the first half of the fiscal year 2000, ended June 30, 2000.  Vivendi reported
revenue of $16.4 billion and net income of $509.1 million for the first half of the fiscal year
ended December 31, 2000, and revenue of $17.4 billion and net income of $254.6 million for the
comparable period in 1999.  Vivendi also reported shareholders' equity of $11.9 billion and total
assets of $73.6 billion as of June 30, 2000.

165.    However, for the reasons set forth in greater detail above in Section IV.B, supra,
Vivendi's historical financial statements and balance sheets contained in its Form F-4 were
materially false and misleading and omitted to state material facts required therein or necessary
to make the statements therein not misleading because, inter alia, the Company was engaged in
improper accounting practices that had the effect of materially overstating Vivendi's reported
revenue and net income, including (a) improperly consolidating into its financial statements
revenue from its Cegetel subsidiary (in which the Company had less than 50% ownership); (b)
failing to write down impaired goodwill from previous corporate investments and acquisitions,

including U.S. Filter; (c) overstated the Company's revenue from its Environmental division

on certain multi-year contracts; and (d) failing to adhere to the accounting policies described in

its SEC filings. In addition, the Form F-4 contained untrue statements of material fact and

omitted to state material facts required therein or necessary to make the statements therein not

misleading because Defendants did not disclose that Vivendi was suffering from a burgeoning

liquidity crisis, as set forth in Section IV.C.

166.    On November 1, 2000, Defendants caused Vivendi to file a Form 6-K with the

SEC reporting Vivendi's financial results for first half of 2000, ended June 30, 2000 (the

"November 1, 2000 6-K"). The November 1, 2000 6-K stated in pertinent part:

> For the first six months of 2000, Vivendi generated net sales of 19.4
> billion euros compared with 18.1 billion euros for first-half 1999,
> representing growth of 7.4%. This amount takes into account the
> disposals of Vinci and Nexity with effect from January 1, 2000. It
> also includes a full six months' impact from the major acquisitions
> made in 999, notably U.S. Filter and Canal+.

*        *        *

> The communications and Environmental services businesses
> accounted for 18.6 billion euros, an increase of 46% which includes
> internal growth of over 15%. Net sales outside France rose 74% to
> 8.6 billion euros.

167.    On November 17, 2000, Defendants caused Vivendi to file a 6-K announcing

Vivendi's revenue for the first nine months of 2000 (the "November 17, 2000 6-K"). The filing

reported that Vivendi's revenues for the first nine months of 2000 were as follows:

> 29.1 billion euros, with Environmental services and
> communications accounting for 28.2 billion euros, a 41.5% increase
> over the 19.9 billion euros as at September 30, 1999. Internal growth
> was close to 14% (19% in communications and 11% in
> Environmental services).

70

188.    The November 1, 2000 6-K and the November 17, 2000 6-K contained untrue statements of material fact and omitted to state material facts required therein or to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section IV.B, *supra*), including: (a) failing to timely write down certain overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel subsidiary in which the Company had less than 50% ownership; (c) failing to consolidate revenue from FT; and (d) overstating the Company's revenue from certain multi-year contracts. In addition, the November 1, 2000 6-K and the November 17, 2000 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a burgeoning liquidity crisis, as set forth above in Section IV.C, *supra*.

169.    On December 22, 2000, Vivendi issued a press release announcing that it had purchased a 35% stake in Maroc Telecom S.A. ("Maroc Telecom") for approximately €2.3 billion. The press release stated that the purchase would "have a positive effect on net income before goodwill from 2001, taken that the company is consolidated." This statement contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the consolidation of Maroc Telecom was improper, for the reasons set forth above in Section IV.B, *supra*.

170.    On January 12, 2001, Defendants caused the text of a December 5, 2000 speech to shareholders to be memorialized in a January 12, 2001 Form 6-K filed with the SEC (the

71

January 12, 2001 6-K"). In the speech, Messier touted Vivendi's quadrupled share price, sevenfold increase in market capitalization and tenfold increase in operating income. He also reported Vivendi's pro forma revenues of "almost 25 billion euros at the end of 2000," and pro forma EBITDA of 3.2 billion euros in the consolidated businesses alone." Calling the figures "reliable and concrete," Messier projected an additional €220 million of EBITDA in 2002 and more than €400 million in 2003. He went on to state that "[w]e are therefore very comfortable with our business and financial performance forecasts, irrespective of the economic climate in the next two years." Messier's December 5, 2000 speech, and the January 12, 2001 6-K on which it was filed with the SEC, contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because the financial results reported therein, rather than being "reliable and concrete," were achieved as a result of the fraudulent accounting scheme described above in Section IV.B, supra. Further, the revenue and EBITDA results reported in the December 5, 2000 speech, and the January 12, 2001 6-K on which it was filed, were materially false and misleading because Defendants' improper consolidation of the results of Cegetel and Maroc Telecom into Vivendi's own results caused these reported financial results to be materially misstated, for the reasons set forth above in Section IV.B.3, supra.

171.    On February 2, 2001, Vivendi announced Vivendi Environnement's total revenue in 2000 was €26.4 billion. Vivendi cited "internal growth of 10.5% and major acquisitions in 1999" as the primary catalysts behind the 25.7% increase over its 1999 revenues. The press release stated that "[c]hanges in the scope of consolidation had a positive impact of €2 billion. External growth was mainly due to the full year effect of acquisitions made in 1999, principally U.S. Filter and Superior Services." These statements contained untrue statements of material

fact and omitted to state material facts required therein or necessary to make the statements

therein not misleading because Vivendi's reported revenue was overstated as a result of the

accounting fraud discussed above in Section IV.B, *supra*.

172.    On February 14, 2001, Vivendi issued a press release in Paris and New York,

memorialized in a February 15, 2001 6-K filing with the SEC (the "February 15, 2001 6-K").

The February 15, 2001 6-K announced preliminary results for the fiscal year ended December

31, 2000 as follows:

> Vivendi Universal's preliminary total revenues for 2000 totaled 41.7
> billion Euros, with media and communications and environmental
> services accounting for 40.0 billion euros, a global 36.5% increase
> over 1999. [Messier said that:] "Vivendi Universal was created on
> December 8, 2000. The 2000 Vivendi [Universal] figures are
> showing the considerable burst of growth of our communications
> activities in 2000 both in global growth and even more important
> with a near 20% internal growth. Vivendi Universal enters its first
> full year of operations with strong growth prospects and a very strong
> balance sheet. This new company is off to a fast start and we are very
> confident that we will meet the very aggressive growth targets we
> have set for ourselves both at the revenues and EBITDA levels.

173.    The February 15, 2001 6-K contained untrue statements of material fact and

omitted to state material facts required therein or necessary to make the statements therein not

misleading because Defendants failed to disclose that Vivendi's reported revenues and purported

growth were overstated as a result of the accounting fraud discussed above in Section IV.B,

*supra*.

174.    In a March 8, 2001 Form 6-K (the "March 8, 2001 6-K"), Defendants caused

Vivendi to report on a Supervisory Board meeting held the same day and chaired by Messier

wherein Vivendi Environnement's financial statements were discussed. The release stated in

part that "[n]et debt was reduced from 16.6 billion euros to 13.2 billion euros, and shareholders'

equity – including minority interests – was increased from 1.5 billion euros to 8.2 billion euros."

73

Vivendi Universal further announced that net income was €615 million, including non-recurring

items after tax.

175.    In a March 9, 2001 Form 6-K signed by Messier (the "March 9, 2001 6-K"),

Vivendi reported "better than expected" fourth quarter and FY 2000 results. Vivendi announced

actual revenues of €41.8 billion for FY 2000, including Media and Communications revenues of

€13.6 billion and Environmental Services revenues of €26.5 billion. The 6-K further stated:

> Vivendi Universal announced today that on a pro forma basis for
> calendar 2000, the Company reported 7.2 billion euros in EBITDA
> . . . for the period ending December 31, 2000, up 48 percent from
> 1999. Results reflect strong performance across the Company's
> business units -- Media and Communications and Environmental
> Services. Actual EBITDA for the 12 months ended December 31,
> 2000, was 6 billion euros versus 4.3 billion euros in 1999.

176.    Vivendi claimed that "the pro forma results were driven by growth in all business

segments with the exception of Internet" and further pointed out that "[n]et income climbed 44

percent, before goodwill, to 2.8 billion euros, from 1.4 billion euros." Messier further stated:

> The strong results that Vivendi Universal has generated for calendar
> 2000 provide a very solid foundation for the Company's growth
> prospects in 2001. The robust performance of Vivendi Universal's
> business segments clearly reflects the fast pace and clear momentum
> that we have established as Vivendi Universal enters 2001. The
> Company's unique combination of content and distribution assets
> paves the way for enormous growth opportunities. We have our
> management teams and plans in place as we moves [sic] to execute
> the growth strategies. The management team, in particular, has been
> focused on the day-to-day operational performance and increased
> productivity of each of the Company's business units. I am very
> confident that, for Media and Communications, we will reach our
> revenue growth target of 10 percent and our aggressive EBITDA
> growth target of 35 percent for the period 2000-2002 and achieve
> superior returns for Vivendi Universal shareholders. . . . Our
> businesses are strong, our management is focused and growth
> prospects are real and immediate.

177.    The March 9, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the reported results were not attributable to the stated causes but, rather, to the accounting fraud set forth above in Section IV.B, *supra*.

178.    In addition to the reasons discussed above, the January 12, 2001 6-K; the February 15, 2001 6-K; the March 8, 2001 6-K; and the March 9, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized above in Section IV.B, *supra*), including: (a) failing to timely write down certain overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc subsidiaries in which the Company had less than 50% ownership; (c) improperly recognizing revenue from its U.S. Filter and Canal+ acquisitions; and (d) failing properly to report pro forma metrics. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a burgeoning liquidity crisis, as set forth above in Section IV.C, *supra*.

179.    In a March 30, 2001 Chairman's Statement and Shareholder Newsletter, filed with the SEC on a Form 6-K on the same date (the "March 30, 2001 6-K"), Messier stated that 2000 pro forma results showed an increase of 20% in revenues and an EBITDA increase of 48%, and that "[t]he EBITDA rise for the media and communications businesses alone is strong[], reaching 76%." Messier also pointed out that Vivendi was "ahead of our targets for 2000" and

75

that he could "confirm the ambitious growth targets . . . for media and communications in October 2000: increases of 10% revenues and 35% for EBITDA." He further stated:

> Since the merger [with Seagram and Canal+], the integration of our teams has progressed well, enabling us to identify and develop synergies. Consumers will soon be seeing the first concrete results. In addition, we are in exceptionally fine financial health — our communications activities are nearly debt free.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose that Vivendi was neither "in exceptionally fine financial health" nor "nearly debt free." Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose that Vivendi was in a precarious financial condition due to the fraudulent accounting scheme and Defendants' active effort to conceal Vivendi's liquidity crisis, set forth above in Sections IV.B and IV.C, *supra*.

180.    On April 24, 2001, Vivendi issued a press release and filed a 6-K (collectively, the "April 24, 2001 6-K") announcing "very strong" first quarter 2001 results. The April 24, 2001 6-K announced that Media and Communications' revenues were up 10% to €5.9 billion and that Telecom's revenues were up 30% to €1.5 billion. The April 24, 2001 6-K further reported that Media and Communications' EBITDA increased 112% to €900 million and that Telecom's EBITDA more than tripled to €433 million. The April 24, 2001 6-K quoted Messier as follows:

> I am very pleased with Vivendi Universal's outstanding performance in our first quarter as a new company. All our results meet or exceed our key operating targets. We created significant momentum by delivering solid first quarter 2001 results in EBITDA, which more than doubled, and by generating double digit revenue growth.
>
> These results show the focus and dedication of all our management teams, in executing the unique promise of Vivendi Universal around

77

its global strategy. This is a great beginning. With our momentum, our targets and the drive of our executive team, I am extremely confident that, for Media and Communications, we will reach our annual EBITDA and revenue growth targets of 35% and 10%, respectively in 2001 and 2002 and achieve superior returns for Vivendi Universal shareholders.

We are also ahead of targets for the synergies which indicate that the path of integration between our teams is great. My only focus is and remains execution of this compelling media merger.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that the results reported were not attributable to the stated caused but, rather, to

the fraudulent accounting scheme as particularized above in Section IV.B, *supra*.

181.    On April 24, 2001, Messier addressed Vivendi's shareholders at the Company's

shareholders' meeting, the transcript of which was subsequently filed on the June 26, 2001 Form

6-K (collectively, the "June 26, 2001 6-K"):

The foundations of our communications related businesses are particularly healthy and strong. I would just like to emphasize a few points:

a healthy balance sheet with total equity reaching 66 billion Euros;

a pro forma net debt that is practically non-existent - around three billion Euros;

Vivendi Universal posted record-high net income, and has cash available for investing (participation in BSkyB, etc.);

Vivendi has rapidly growing revenue, which reach the double digits annually, spread out through all the European and American markets (60% and 40%): extraordinarily large customer bases; several dozen million subscribers; business models often based on subscription - meaning loyalty; recurrence, predictable revenues, and very little dependence on the advertising market.

Financially, Vivendi Universal, concerning the communications sectors, is rock solid - very stable with high growth.

*    *    *

In my role as the chairman and as an employee of the company, I owe you the company's results. Here they are. They are good. . . . Vivendi Universal, our company, your company, is solid. Today, we are a leader, strong, dynamic, and profitable.

182.    On May 18, 2001, Vivendi filed a Form 6-K with the SEC and issued a press release providing total revenue information for first quarter 2001 (collectively, the "May 18, 2001 6-K"). The May 18, 2001 6-K stated in part:

Vivendi Universal revenue for first quarter of 2001 totaled 12.6 billion euros, a global 34.5% increase over the first quarter of the prior year. Vivendi Universal's media and communications businesses accounted for 5.9 billion euros and environmental services businesses accounted for 6.7 billion euros.

183.    The March 30, 2001 6-K; the April 24, 2001 6-K; the June 26, 2001 6-K; and the May 18, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized above in Section IV.B, *supra*), including: (a) failing to timely write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel subsidiary in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis (as particularized above in Section IV.C, *supra*) and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

184.    On July 2, 2001, Vivendi filed its Form 20-F with the SEC, signed by Hannezo,

for the fiscal year ended December 31, 2000 (the "2000 Form 20-F"). The 2000 Form 20-F

contained Vivendi's consolidated financial statements for the years ended December 31, 2000,

1999 and 1998 and as at December 31, 2000 and 1999. The 2000 Form 20-F stated as follows:

> For the years ended December 31, 2000, 1999 and 1998, we had a net
> income under U.S. GAAP of €1,907.8 million, €246.1 million and
> €565.2 million, respectively, compared to €2,229.0 million, €1,431.4
> million and €1,120.8 million under French GAAP. Under U.S.
> GAAP, shareholders' equity was €64,729.4 million and €16,954.5
> million for 2000 and 1999, respectively, compared to €56,671.1
> million and €10,892.2 million under French GAAP.

185.    The 2000 Form 20-F further reported on marketing rights, stating:

> As of January 1, 2000, the following new accounting principles were
> adopted:

*        *        *

> Sports broadcasting rights acquired by Canal+ are now capitalized as
> intangible assets and are amortized over the period of the agreement.
> The cumulative effect of this change had no impact on net income in
> 2000 and 1999. Total assets increased by €2.0 billion (most of which
> related to intangible assets) and total liabilities and shareholders'
> equity increased by the same amount.

186.    When discussing Accounting Policies, the 2000 Form 20-F stated that revenues

and costs for the music segment were recognized upon shipment to third parties and that revenue

relating to public service contracts was recognized when the services were rendered.

187.    For the reasons set forth above in Section IV.B, *supra*, Vivendi's historical

financial statements and balance sheets contained in its 2000 Form 20-F contained untrue

statements of material fact and omitted to state material facts required therein or necessary to

make the statements therein not misleading because, *inter alia*, Defendants failed to disclose that

the Company improperly consolidated into its financials revenue from its Cegetel subsidiary (in

79

which the Company had less than 50% ownership), improperly manipulated EBITDA, failed to

timely write down impaired goodwill from previous corporate investments and acquisitions,

including Canal+ and U.S. Filter, overstated the Company's revenue from its Environnement

division on certain multi-year contracts in violation of GAAP, failed to adhere to the accounting

policies described in its SEC filings, and inflated the value of certain Canal+ assets. Further,

these statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that Vivendi was suffering from a burgeoning liquidity crisis, as set forth above

in Section IV.C, *supra*.

188.   On July 23, 2001, Vivendi Universal issued a press release and filed a Form 6-K

(collectively, the "July 23, 2001 6-K") announcing its "very strong" second quarter and first half

2001 Media and Communications results. Vivendi reported Media and Communications'

revenues were up 16% (excluding Universal Studios Group) to €6.6 billion, and EBITDA grew

57% to €1.3 billion. Concerning Vivendi's first half 2001 results for Media and

Communications businesses, the press release stated in part:

In the course of the first half of 2001, Vivendi Universal achieved
three quarters of its full-year target of incremental EBITDA (nearly
800 million euros excluding Maroc Telecom, relative to the
company's target of slightly more than 1 billion euros).

In the first half of 2001, revenues increased to 12.4 billion euros (up
15% [excluding USG]), and EBITDA *grew* to 2.2 billion euros (up
77% over 2000 comparable period).

During a strong second quarter, revenues increased 16% to 6.6 billion
euros, and EBITDA grew 57% to 1.3 billion euros.

Excluding Maroc Telecom, revenue growth was 8%, and EBITDA
growth was 35% for the first half of 2001. For the second quarter,
revenues were up 11% and EBITDA was up 62%.   [footnotes
omitted]

189.   The July 23, 2001 6-K also reported on the Telecom segment, stating

Telecom EBITDA was €703m for the quarter ended June 30, 2001
and €1.1b for the first half for the first half ended June 30, 2001.

\*          \*          \*

Telecom registered an excellent second quarter and a half year. The
second quarter of 2001, revenues increased by 51%, and EBITDA
grew by 70% versus second quarter 2000.

190.   Messier commented on the results, stating in part as follows:

The results produced by Vivendi Universal in the second quarter are
well ahead of market consensus. . . . They confirm the robustness of
our businesses . . . and the fast progress of the reorganization and
implementation of our recent merger.

With three quarters of the 'aggressive' incremental EBITDA target
for the full year 2001 [(1.12 billion euros of incremental EBITDA, or
35%, over the pro forma 2000 guidance provided last October and
slightly above 1 billion euros of incremental EBITDA over the final
2000 results)] already achieved in the first half of the year, I can only
re-emphasize our confidence.   We will at least meet our stated
targets.

Obviously, our current stock price does not fully reflect this situation
in terms of EBITDA multiples or Enterprise Value to EBITDA to
growth. With the highest growth rates of the industry and the lowest
multiples, our stock is definitely an attractive investment today.

The first half has been a period of total operational focus in each of
our businesses, while completing significant achievements in the
implementation of the merger, reorganization and execution of our
strategy.

191.   Following the July 23, 2001 press release, Vivendi hosted a conference call to

discuss the second quarter 2001 results and the Company's business and prospects. A July 26,

2001 analyst report by Commerzebank reported that "Messier is confident the company will

reach its own targets." As the plaintiffs in the Securities Class Action allege, during the

conference call, Messier and others in Vivendi management stated:

18

> Vivendi was able to achieve strong results even in a down market and was in fact gaining market share.

> The Company was still on track to achieve strong growth in revenues and earnings in 2001, including EBITDA growth of 35%.

The statements made by Vivendi management during the conference call contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because they failed to disclose that Vivendi was able to achieve the purportedly "strong results" reported only as a result of the accounting fraud as set forth above in Section IV.B, supra, and Defendants' active concealment of the Company's burgeoning liquidity crisis, as discussed above in Section IV.C, supra.

192.     On August 10, 2001, Vivendi Universal issued a press release and filed a 6-K (collectively, the "August 10, 2001 6-K") announcing its total revenue for the first half of 2001, including the second quarter. Second quarter 2001 revenue totaled €13.9 billion, "comprised of 6.6 billion euros for media communications businesses and 7.3 billion euros for environmental services businesses." The first half of 2001 total revenue for Vivendi Universal was €26.4 billion, "comprised of 12.4 billion euros for media and communications businesses and 13.9 billion euros for environmental services businesses."

193.     In early September 2001, Vivendi's ADSs declined from the mid-$50s to the mid-$40s per share, and its ordinary shares declined from the mid-€50s to the mid-€40s. In response, Defendants categorically denied any problems. Vivendi, after the market closed on September 5, 2001, reiterated its targets for 2001 and 2002. Messier stated in an interview with Reuters that evening that "no profit warning of any kind needs to be feared coming from Vivendi Universal." Messier's statement contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he

failed to disclose that Vivendi's security in its targets and in the fact that it would not have to

issue any profit warning was attributable to the accounting fraud as set forth above at Section

IV.B, and to its active concealment of the Company' liquidity crisis, as discussed above in

Section IV.C, *supra*.

194.    On September 25, 2001, Vivendi issued a press release and filed a Form 6-K

(collectively, the "September 25, 2001 6-K") announcing "Strong First Half 2001" results and a

"Solid Outlook for 2002." The press release reported that revenues increased 11% to €26.4

billion, that EBITDA grew 42% to nearly €4 billion, that operating income grew 65% to €1.9

billion, and that net income, before goodwill amortization, reached €1.1 billion or €0.97 per

share. With respect to Media and Communications, the release reported that first half 2001

revenues reached €12.4 billion, up 15%, EBITDA reached €2.2 billion, up 77%, and that

operating income nearly tripled to €946 million, up 184%. Concerning Vivendi's

Environnement business, the release reported that revenues were up 11% to €13.9 billion, that

EBITDA was up 12% to €1.76 billion, and that operating income was up 13% to €0.97 billion.

In the filing, Messier commented:

Despite the current environment, we will reach all our previously stated revenue/EBITDA objectives for the 2001 year. I continue to express my confidence in achieving our more than 10% revenue growth targets for 2001 and our more than 35% EBITDA growth (versus the company's October 2000 guidance) at a constant asset base. This, combined with some extensions in the company's asset base (i.e, Maroc Telecom and Houghton Mifflin), should result in full-year Media and Communications EBITDA slightly north of 5 billion euros. In the current Environnement, giving a 2002 target would not be meaningful, and we have yet to complete our 2002 budget and plan process. Before the recent tragedy [of September 11], market consensus for 2002 EBITDA was not far from 6 billion euros. Despite the events, looking at the trends of our businesses and our defensive qualities, we are currently very comfortable [sic] with this expectation. (Footnote omitted.)

195.    On October 17, 2001, Vivendi Universal filed a Form 6-K (the "October 17, 2001 6-K") announcing its consolidated half-year financial statements as filed with regulatory authorities in France. The October 17, 2001 6-K reported:

> In the first half of 2001, Vivendi Universal's revenues increased to €26.4 billion from €19.4 billion in the comparable period of 2000. On a pro forma basis the revenue increase was 11.5%
> The parent company recorded revenues of €64.1 million and net income of €149.7 million in first half 2001.

Media and Communications reported a revenue increase to "€12.4 billion, up 12.4% over the pro forma first half of 2000. Excluding Maroc Telecom and Universal Studios Group ('USG') Filmed Entertainment, revenue growth was 11%." Environnement Services reported revenues of "€13.9 billion compared to €12.5 billion in the first half 2000, an 11.3% increase."

196.    The July 23, 2001 6-K, the August 10, 2001 6-K, the September 25, 2001 6-K and the October 17, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, inter alia, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized above in Section IV.B, supra), including: (a) failing timely to write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc subsidiaries in which the Company had less than 50% ownership; (c) overstating the Company's revenue from certain multi-year contracts, (d) improper EBITDA manipulation; and (e) the inflation of certain Canal+ assets. In addition, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis (as particularized above in Section IV.B, supra)

and that Vivendi would necessarily need to restructure its debt obligations in order to remain

solvent and avoid bankruptcy. Further, these statements contained untrue statements of material

fact and omitted to state material facts required therein or necessary to make the statements

therein not misleading because Defendants failed to disclose that Vivendi was not adhering to the

"Significant Accounting Policies" listed in its 2000 Form 20-F but, rather, was preparing its

financial statements using accounting policies that violated GAAP.

197.     On October 30, 2001, Vivendi issued a press release and filed a Form 6-K

(collectively, the "October 30, 2001 6-K") announcing its third quarter 2001 Media and

Communications results. The October 30, 2001 6-K announced that Media and

Communications' revenues were up 24 % to €7.3 billion, and that EBITDA was up 90% to €1.5

billion. This 6-K further reported that Telecom's revenues increased by 17%, and EBITDA grew

by 31% versus pro forma results for the third quarter of 2000. Music EBITDA was €250 million

for the quarter ended September 30, 2001 and €702 million for the nine months ended September

30, 2001. UMG reported a 6% increase in EBITDA to €250 million. The 6-K also stated in

pertinent part:

On a pro forma basis, third quarter revenue growth was 8%, and
EBITDA growth was 30%. Year-to-date revenues increased 9%, and
EBITDA increased 46%.

Company reaffirms confidence in achieving its growth targets: 10%
revenue growth and 35% organic EBITDA growth in 2001.

198.     Messier was quoted in the October 30, 2001 6-K as follows:

Our third quarter results for the media and communications
businesses, with 24% revenue and 90% EBITDA growth, including
organic growth of 8% and 36% respectively, are obviously strong
despite the tough environment. . . . They reflect both our higher
potential for growth and greater resiliency to recessionary
environments compared to many of our peers.

98

199.    Following the release of the October 30, 2001 6-K, Vivendi hosted a conference

call to discuss the third quarter 2001 results and the Company's business and prospects.    As

reported in the complaint in the Securities Class Action, during the call, Messier and others in

Vivendi management stated:

Vivendi was able to achieve strong results even in a down market and
was in fact gaining market share;

The Company was still on track to achieve strong growth in revenues
and earnings in 2001.

*        *        *

Additionally, Vivendi Universal's media and communications
businesses are presently less vulnerable to recessionary environments
than many of our peers because of our strong defensive qualities.

*        *        *

Having the highest resiliency and lowest sensitivity to a recessionary
environment explains our ability to outperform most of our peers.

*        *        *

An early look at the fourth quarter indicates that we are on track to
meet our targets. I continue to express my confidence in achieving
10% revenue growth and 35% EBITDA growth in 2001 at a constant
asset base. This, combined with some expansions in the company's
asset base (i.e., Maroc Telecom and Houghton Mifflin), should result
in full-year Media and Communications EBITDA slightly above 5
billion euros. (Footnotes omitted.)

Messier's statements contained untrue statements of material fact and omitted to state material

facts required therein or necessary to make the statements therein not misleading because he

failed to disclose that the results reported were not attributable to the stated causes but, rather, to

the accounting fraud particularized in Section IV.B, supra, and to Defendants' concealment of

the liquidity crisis discussed above in Section IV.C, supra.

The statements made by Vivendi management during the conference call contained untrue

statements of material fact and omitted to state material facts required therein or necessary to

make the statements therein not misleading because they failed to disclose that the Company was

only able to achieve the results reported through the accounting fraud discussed above in Section

IV.B, *supra*, and through their concealment of the liquidity crisis the Company was facing, as set

forth above in Section IV.C, *supra*.

200.    Based on Defendants' statements, including those made during the conference

call, securities analysts that followed Vivendi securities reacted positively to the Company's

reported financial results. For example, on October 31, 2001, ING Barings ("ING") issued a

"Strong Buy" recommendation, stating:

> Vivendi . . . is one of the few media groups not to have issued a profit
> warning since the beginning of the year. Management has stressed its
> confidence once again and remains comfortable with the consensus
> forecasts.

201.    On November 14, 2001, Vivendi Universal filed a Form 6-K (the "November 14,

2001 6-K") incorporating Messier's shareholder newsletter. Messier trumpeted Vivendi

Universal's first-half 2001 earnings as "good" and stated that "we are in a position to confirm

our annual targets with confidence despite the economic climate." He further stated:

> For the company as a whole, revenues are up 11%, generating a 42%
> increase in EBITDA to almost 4 billion euros. The Media and
> Communications businesses posted a 77% increase in EBITDA and a
> 184% increase in EBIT, while Environmental Services businesses
> have continued to grow steadily in terms of both revenues (11%) and
> EBITDA (12%). Vivendi Universal's primary strength is its
> operational strength.

202.    On December 6, 2001, Vivendi issued a press release and filed a Form 6-K

announcing the decision of Edgar Bronfman, Jr. ("Bronfman") to resign from his position as

Executive Vice Chairman of Vivendi. Bronfman remained as "Vice-Chairman of the Board and

87

88

an advisor to the company." Commenting on Bronfman's resignation, Messier assured the

investing public that Vivendi "is in a very strong position, with solid performance in virtually

every business." Messier's statements contained untrue statements of material fact and omitted

to state material facts required therein or necessary to make the statements therein not misleading

because he failed to disclose that Vivendi was not in a "very strong position" but, rather, was in a

precarious financial position as a result of the accounting fraud discussed above in Section IV.B,

*supra*, and was suffering from a liquidity crisis, as more particularized above in Section IV.C,

*supra*. Further, these statements contained untrue statements of material fact and omitted to state

material facts required therein or necessary to make the statements therein not misleading

because Messier failed to disclose that Vivendi's purportedly "solid performance" was

attributable to the accounting fraud discussed above in Section IV.B, *supra*, and to Defendants'

active concealment of the liquidity crisis the Company was facing, as more particularized above

in Section IV.C, *supra*.

203.    On December 11, 2001, Defendants caused Vivendi to file a Form 6-K (the

"December 11, 2001 6-K") announcing the revenue figures filed with French authorities. In the

Form 6-K, Vivendi announced:

> [T]he company's Media and Communications businesses reported
> pro forma revenue growth of 9% for the year ended December 31,
> 2001, reaching 28.9 billion euros. Revenue growth was 10% using
> the 2000 perimeter excluding Universal Film, exactly in line with
> management estimates given 12 months ago.

Messier further stated that he was "pleased that we achieved our ambitious target of 10% organic

revenue growth in 2001, for the businesses resulting from Vivendi's merger with Seagram and

Canal+."

68

204.    The October 30, 2001 6-K, the November 14, 2001 6-K and the December 11, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized in Section IV.B, *supra*), including: (a) failing to timely write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc subsidiaries in which the Company had less than 50% ownership; (c) overstating the Company's revenue from certain multi-year contracts, (d) improper EBITDA manipulation; and (e) the inflation of certain Canal+ assets. In addition, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis (as particularized in Section IV.C, *supra*) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was not adhering to the "Significant Accounting Policies" listed in its 2000 Form 20-F but, rather, was preparing its financial statements using accounting policies that violated GAAP.

205.    In a December 13, 2001 press release, the Company announced that it had "authorized Goldman Sachs and Deutsche Bank to carry out a [$1.5 billion] placement of BSkyB share certificates that must be converted in October 2002." The press release went on to state:

Following last week's sale of 9.3% of Vivendi Environnement and with this transaction, Vivendi Universal will then be in a position to

90

cover any needs that may arise from various opportunities for strategic partnerships in the U.S. television and distribution segments. Such opportunities may or may not be taken up.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis, as discussed above in Section IV.C, *supra*.

206.    The next day, on December 14, 2001, the *Financial Times* (London) reported on the announced sale of Vivendi's $1.5 billion interest in BSkyB and the sale of a $1.06 billion interest in Vivendi Environnement. The article quoted Vivendi as stating that these asset sales would give Vivendi "room to manoeuvre" for additional acquisitions, and enable it "to cover any eventual needs from different opportunities for strategic partnerships." These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis, as discussed above in Section IV.C, *supra*.

207.    On December 17, 2001, Vivendi issued a press release in Paris and New York and filed a Form 6-K announcing the acquisition of USA Networks for $10.3 billion in combined stock and cash. The acquisition was financed by an exchange of securities and "limited" cash outlay by Vivendi. Commenting on the acquisition, Messier stated in pertinent part:

Our strategy is clearly coming together. Combining within the same operational entity, VUE, USG and the entertainment assets of USA creates a new U.S. major, which will benefit from the full integration of TV and movies activities with production and distribution.

*    *    *

In addition, this strategic move will significantly benefit Vivendi Universal shareholders, because of its significant value-accretion at every level – EBITDA, net income and free cash flow. By using

mainly non-core, consolidated assets to acquire this control, we are strongly positioned to enhance performance and value to Vivendi Universal shareholders.

* * *

> At the end of just one year following our merger with Seagram and Canal+, we have put the pieces together in fulfilling our strategy. In one short year, we have focused on integration and addressing our relative distribution weakness in the U.S. - and here we are today. We expect that 2002 will be a year of growth, without further change in perimeter.

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that the Company was not "strongly positioned to enhance performance and value to Vivendi Universal shareholders" but, rather, was in a precarious financial condition due to the Defendants' concealment of Vivendi's liquidity crisis from the investing public.

208.    According to the Norges Bank Action, on December 17, 2001, Messier held a press conference with Barry Diller, Chairman and CEO of USA Network, at the St. Regis Hotel in New York City to discuss the acquisition of USA Networks, the creation of Vivendi Universal Entertainment ("VUE"), and Vivendi's prospects for 2002:

> At the end of the day, this transaction is not putting pressure on Vivendi Universal. On the reverse, what it allows us to do is to increase our [EBITDA] target for 2002 by more than ten percent. It's to increase our net income in 2002 by roughly 200 million dollars. It's to increase the net free cash flow of the group in 2002 by, let's say three hundred and fifty million dollars. At every level of the [P&L] and of the cash flow that you may look at, this transaction is very positive to VUE shareholders year one.

* * *

> As far as the global [debt] ratio of the group is concerned, our target is to have in '02 a debt to [EBITDA] ratio well below three times and especially we are focusing to reach that target ahead of the end of the first half of 2002, which means that Vivendi Universal will end up its

16

program of selling its non core asset in the first half of '02; it will give us very comfortable triple B credit rating targets that we are very comfortable with. . . . So, no cleaning of balance sheet because the balance sheet is clean. . . . [W]e are committed to issue full U.S. [GAAP] earnings starting Q1 of'02. We already, in fact, worked on the basis of U.S. [GAAP] accounting methods in '01 in order to build our track record at the time of this year, at the time of the release of our first full quarterly U.S. [GAAP] in '02. So we are already applying all U.S. [GAAP] methodologies, including those relating to amortization.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose that Vivendi was not applying "U.S. [GAAP] methodologies" but, rather, was engaging in accounting fraud as discussed above in Section IV.B, supra.

209.    As the plaintiffs in the Securities Class Action alleged, on February 6, 2002, AFX News Limited reported that in an attempt to dispel concern about the Company's debt levels and accounting practices, a letter was distributed to the Company's employees stating that no profit warnings were forthcoming:

Vivendi Universal CEO Jean-Marie Messier said the media company will not make any change in its guidance for 2001 earnings due for release on March 5, although the fourth quarter was a difficult period.

Messier made the comment in a letter to Vivendi's staff, addressing the recent volatility and losses in the company's share price...

"Some global markets, including the music market, declined during this period. But despite the difficulties, we are the only media company not to have issued a profit warning on its operating results and there's no change to that situation," said Messier.

"There are no hidden risks and no speculative instruments," he said.

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because,

92

contrary to his assertions, there were "hidden risks" associated with Vivendi – the accounting

fraud and liquidity crisis discussed above in Sections IV.B and IV.C, *supra*.

210.    On February 11, 2002, Vivendi issued a press release (the "February 11, 2002

Press Release") announcing its year-end 2001 Media and Communications results. Vivendi

announced Media and Communications "pro forma revenue growth of 9% for the year ended

December 31, 2001, reaching 28.9 billion euros." The release further reported that Vivendi's

Telecom segment achieved 24% revenue growth in 2001, and that "[r]evenue growth was 10%

using the 2000 perimeter excluding Universal Film, exactly in line with management estimates

given 12 months ago."

211.    Commenting on the results, Messier stated:

> I am pleased that we achieved our ambitious target of 10% organic
> revenue growth in 2001, for the businesses resulting from Vivendi's
> merger with Seagram and Canal+. Organic growth is, more than ever
> in today's markets, the most important strength of Vivendi Universal.
> Achieving the highest level of growth in our industry is a big
> differentiation of Vivendi Universal, and the operating management
> deserves recognition for fulfilling their growth objectives and
> outperforming their peers in a difficult year. Our 2001 results give us
> confidence that we can achieve our growth targets again in 2002.

212.    The February 11, 2002 Press Release contained untrue statements of material fact

and omitted to state material facts required therein or necessary to make the statements therein

not misleading because, *inter alia*, the Company was engaged in improper accounting practices

that had the effect of materially overstating Vivendi's reported earnings (as particularized above

in Section IV.B, *supra*), including: (a) failing to timely write down overvalued assets from

previous corporate investments and acquisitions; (b) improperly consolidating into its financials

revenue from its Cegetel and Maroc Telecom subsidiaries, in which the Company had less than

50% ownership; (c) overstating the Company's revenue from certain multi-year contracts; and

93

(d) failing to follow its own accounting policies. In addition, the February 11, 2002 Press Release contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was suffering from a liquidity crisis (as particularized above in Section IV.C., *supra*), and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

213.    On March 4, 2002, Messier was quoted in the *Financial Times* as stating that Vivendi had only two significant off-balance sheet structures, one relating to shares it is selling in BSkYB and another relating to four buildings: "There are no hidden risks and no speculative instruments." Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, contrary to his assertions, there were "hidden risks" associated with Vivendi – the accounting fraud and liquidity crisis set forth above in Sections IV.B and IV.C, *supra*.

214.    On March 5, 2002, Vivendi issued a press release and filed a Form 6-K (collectively, the "March 5, 2002 6-K") proclaiming its year-end 2001 results. Vivendi announced that revenues of €57.3 billion reflected a 10% increase and that operating income of €3.79 billion reflected a 47% increase, on a pro forma basis.

215.    The March 5, 2002 6-K included financial information by business segment. The release further reported Media and Communications revenues of €28.1 billion, representing 10% pro forma revenue growth; EBITDA of €5 billion, representing 34% pro forma EBITDA growth; and operating income of €1.8 billion, representing 89% pro forma growth. In addition, Telecom's pro forma revenue was up 24% to €8 billion and its EBITDA increased 49% to €2.5 billion. Further, the March 5, 2002 Form 6-K listed Telecom EBITDA of €2.3 billion as 46% of

Media and Communications EBITDA of €5 billion. Telecom's operating income was €1.3

billion, which was 72% of Media and Communications' operating income of €1.8 billion. The

Telecom pro forma EBITDA was reported as growing by 49%, with Maroc Telecom reporting a

pro forma EBITDA gain of 33%. EBITDA was discussed as follows:

> EBITDA consists of operating income before depreciation, amortization (including film amortization at CANAL+ Group and book plate amortization at VUP), restructuring charges and other one-time items (principally reorganization costs at CANAL+ Group), and does not reflect adjustment for any minority interests in fully consolidated subsidiaries. EBITDA is presented and discussed because Vivendi Universal management considers it an important indicator of the operational strength and performance of its Media and Communications businesses, including the ability to provide cash flows to service debt and fund capital expenditures.

*       *       *

> U.S. GAAP requires consolidation by whatever company manages the assets, controls the board of directors and possesses majority voting control. VU is required under U.S. (and French) GAAP to consolidate Cegetel and Maroc Telecom since they meet these criteria.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because the

consolidation of Cegetel and Maroc Telecom was not "required" under U.S. GAAP but, rather,

violated GAAP as set forth above in Section IV.B, *supra*.

216.     In discussing off balance sheet transactions, Vivendi stated that there were "no

off-balance sheet loans that have not been disclosed or any such items that would create

accounting benefits" and that Vivendi regards "cash as king." Vivendi attached a document to

its March 5, 2002 Form 6-K that would "provide full disclosure of our off balance sheet

financing as well as other matters" for the Media and Communications division. Here, Vivendi

stated that "[p]hilosophically, VU prefers to keep its obligations on the balance sheet." Only two

95

96

off-balance sheet financing vehicles were reported: ''two qualifying special purpose entities

associated with the sale of 400 million BSkyB shares.'' These statements contained untrue

statements of material fact and omitted to state material facts required therein or necessary to

make the statements therein not misleading because Vivendi failed to disclose the existence of

two significant obligations, the Cegetel current account and the Maroc Telecom side agreement,

set forth above in Section IV.C, *supra*.

217.    Vivendi also reported a charge for impairment to goodwill under French GAAP of

€12.6 billion, including €6 billion for Canal+. Debt in French GAAP was listed as €14.6 billion

for the Media and Communications activities; under U.S. GAAP, debt was €19.1 billion. The

release also stated in part:

> After having been the only large media company not to modify any of
> its guidance for the year 2001, Vivendi Universal reiterates its
> confidence in the strength of its businesses and their performance and
> their ability to grow.    For 2002, no other new guidance will be
> expressed, apart from the company's full confidence to reach for its
> Media and Communications businesses.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants,

despite their alleged ''confidence'' in the strength of Vivendi's business, were concealing both the

accounting fraud discussed above in Section IV.B, *supra*, and the liquidity crisis discussed above

in Section IV.C, *supra*.

218.    The March 5, 2002 6-K also touted the Company's ''Operating Free Cash Flow''

as being ''ahead of guidance'' and announced Media and Communications operating free cash

flow of €2.026 billion, ''up 2 billion euros over 2000.'' Commenting on the results, Messier

stated in part as follows:

I am very pleased with the excellent operating results that have been achieved. These results confirm the strength of Vivendi Universal's businesses across the board despite a very difficult global economic environment.

Most of our businesses improved market share, EBITDA and free cash flow during this period of global economic slowing. Even more important, those operational performances are showing improvement at every level of our P&L. The good EBITDA to EBIT transformation ratio: 68% of incremental EBITDA translating in incremental EBIT, is a strong and positive sign. The improvement of operational free cash-flow (FCF) at a higher rate than EBITDA indicates the clear focus given in 2001 to cash management. We will continue this effort.

*     *     *

We stay fully committed to conveying full transparency in our financial results. Vivendi Universal is not only transparent but is the only media and communications company not to change its numbers and targets, it underscores its commitment to accurate, conservative and consistent reporting in every area of its operations.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the results reported were not attributable to the reasons stated but, rather, to the accounting fraud discussed above in Section IV.B, *supra*, and their active concealment of the liquidity crisis discussed above in Section IV.C, *supra*. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants were not "fully committed to conveying full transparency" in Vivendi's financial results but, rather, were employing fraudulent accounting to burnish the Company's actual performance, as set forth above in Section IV.B, *supra*.

219.   The March 5, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading